[No. 11111.    Department Two.—May 19, 1888.]

## WILLIAM C. BLACKWOOD, APPELLANT, v. CUTTING PACKING COMPANY, RESPONDENT.

AGREEMENT TO SELL PROPERTY NOT IN EXISTENCE—IMPLIED WARRANTY AS TO QUALITY. — One who agrees to sell the crop of fruit of a future season gives an implied warranty as to quality.

ID. — PASSING OF THE TITLE. — In such case the title does not pass in the absence of circumstances showing a contrary intention; and therefore the transaction is an agreement to sell as distinguished from a sale.

ID. — CASH ON DELIVERY. — Where the terms are cash on delivery, and there has been neither payment nor delivery, the title does not pass, in the absence of circumstances showing a contrary intention.

ID. — GOODS NOT IN DELIVERABLE CONDITION. — Where it is the duty of the vendor to put the goods into a deliverable condition, and he has not done so, the title does not pass, in the absence of circumstances showing a contrary intention.

ID. — GOODS NOT IDENTIFIED. — If the goods are not identified, the title does not pass, in the absence of circumstances showing a contrary intention.

ID. — THE WORD "SOLD." — As against the controlling features above mentioned, the word "sold" is not conclusive.

ACCEPTANCE — WAIVER. — The buyer does not lose his rights arising from a breach of warranty by accepting and using a portion of the goods, if it was agreed at the time of such acceptance that the rights of the parties were not to be affected thereby.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from an order refusing a new trial.

The facts are stated in the opinion.

*A. A. Moore, George W. Reed,* and *Arthur Rodgers,* for Appellant.

The contract in question was a sale, and not an agreement to sell, and therefore section 1768 of the Civil Code, defining what warranties are implied in agreements to sell merchandise not in existence, has no application. (Sheppard's Touchstone, 24; *Arques* v. *Wasson,* 51 Cal. 620; 21 Am. Rep. 718; *Grantham* v. *Hawley,* Hob. 132; *Conderman* v. *Smith,* 41 Barb. 404; *Van Hoosen* v. *Cory,* 34 Barb. 12; Benjamin on Sales, sec. 78; 2 Kent's Com., p. 468, note *g; Sanborn* v. *Benedict,* 78 Ill. 309; *Heald* v. *B. Ins. Co.,* 111 Mass. 38; *Lewis* v. *Lyman,* 39 Mass. 443; *Smith* v. *Atkins,* 18 Vt. 461.)   The term "merchandise," as used in section 1768 of the Civil Code, does not include such articles as an entire crop of fruit to be grown by the seller. (*Sewall* v. *Allen,* 6 Wend. 335; Abbott's Law Dict., tit. Merchandise.)

*A. N. Drown,* for Respondent.

HAYNE, C.—Action for the price of apricots alleged to have been sold to defendant. Defense, the breach of an implied warranty as to quality.

The contract was in two parts. The part signed by the defendant was as follows:—

"SAN FRANCISCO, Sept. 17, 1881.

"Bought of W. C. Blackwood his crop of apricots at Haywards, for the seasons of 1882, 1883, 1884, 1885, and 1886, not less than seventy-five tons and not exceeding two hundred tons per annum, at three cents per pound, f. o. b. (free on board cars at) Haywards.

"CUTTING PACKING COMPANY,

"By A. D. CUTLER."

The part signed by the plaintiff was similar to the above, except that it said: "Sold my crop of apricots," and "Sold Cutting Packing Company." The court below gave judgment for the defendant, and the plaintiff appeals.

1. The first question is, whether there was any warranty. The defendant relies upon section 1768 of the Civil Code, which is as follows:—

"Sec. 1768. One *who agrees to sell* merchandise not then in existence .thereby warrants that it shall be sound and merchantable at the place of production contemplated by the parties, and as nearly so at the place of delivery as can be secured by reasonable care."

The plaintiff contends, in the first place, that apricots are not "merchandise." A walk through the markets would probably convince him that he is mistaken. It is said, however, that such fruit comes under the head of "produce." Very likely it does. But we think that the word "merchandise" is used in the above section in a large sense, and covers all kinds of personal property which is ordinarily bought and sold in the market. Whether it covers more than that need not be decided in this case. This point of plaintiff is not unlike saying that a promissory note between farmers is not a negotiable instrument, because such an instrument is a creation of the law between "merchants."

And we think, also, that the future crops of fruit come under the head of merchandise "not then in existence." Section 1770 covers the case of an article manufactured to order; and section 1771 the case of merchandise "inaccessible to the examination of the buyer," which probably refers to merchandise in existence. Taking the three sections together, we think that the one above quoted applies to a case like the present.

It is argued for the plaintiff, however, that the transaction was a sale, and not an agreement to sell, and that therefore the section does not apply.

The fundamental difference between a sale, properly so called, and an agreement to sell is, that in the former case the title passes, while in the latter case it does not. The inquiry in this regard, therefore, must be as to whether the title passed. And it is to be observed that the point of time to which the inquiry must relate in the present case is the time the contract was entered into.

Some question is made by counsel as to whether the title to a thing which is not in existence can pass. But we shall assume in favor of the plaintiff that the fruit to be produced from trees already grown and the property of the plaintiff has such a potential existence as to be the subject of sale.

It seems well settled that the question as to whether the title has passed is one as to the intention of the parties. And such intention is, as a matter of course, to be gathered from the language of the parties, considered in the light of all the circumstances of the case. But in the absence of anything showing a contrary intent, there are certain circumstances which have a controlling force, and these exist in the present case.

(*a*) There was at the time to which the inquiry relates neither delivery of the goods nor payment of the price. The contract says that the fruit was bought "at three cents per pound, f. o. b. (free on board cars at) Haywards." This, as we construe it, is an expression of intention that the price was to be paid or to become due when the fruit was delivered to the carrier at Haywards. But the result would be the same if the words quoted do not express such an intention. For if the time of payment be left indefinite, the law implies that it is to be on the delivery of the goods. (Civ. Code, sec. 1784; *Dyer* v. *Duquid*, 70 Ill. 307; *Case* v. *Dewey*, 55 Mich. 118.) In common phrase, the terms were cash on delivery. And where such is the case, the delivery of the goods and the payment of the price are conditions concurrent. And if the condition of payment is not

waived, the title does not pass until the price is paid. (*Peabody* v. *Maguire*, 79 Me. 585; *Evansville R. R. Co.* v. *Erwin*, 84 Ind. 464, 465; *Turner* v. *Moore*, 58 Vt. 456; *Adams* v. *O'Connor*, 100 Mass. 515; 1 Am. Rep. 137; *Hoffman* v. *Culver*, 7 Bradw. 454.) It frequently happens that the seller will deliver the goods notwithstanding the failure to fulfill the condition of payment; and in such cases the question arises as to whether such delivery is not to be considered a waiver of the condition. Some courts hold that in the absence of circumstances showing a contrary intention the condition is waived, and that the title passes. But where, as here, there was neither delivery nor payment, there can be no doubt but that the title does not pass. (*Dixon* v. *Duke*, 85 Ind. 435, 436.)

(*b*) There are other circumstances which constitute more specific criteria than the above. The goods were not in a condition in which the buyer could be called upon to accept them. Benjamin gives the following rule in this regard:—

"Where by the agreement the vendor is to do anything to the goods for the purpose of putting them into that state into which the purchaser is to be bound to accept them, or, as it is sometimes worded, into a deliverable state, the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition precedent to the vesting of the property." (Benjamin on Sales, b. 2, c. 3.)

In this case the seller was to give the necessary cultivation to the orchard, pick the fruit, pack it in suitable boxes or baskets, and deliver it to the carrier at Haywards.

(*c*) There is yet another circumstance. The portion of the crop to be delivered had not been identified. What was contracted for was to be "not less than seventy-five tons and not exceeding two hundred tons per annum." Possibly it might be argued that if any

crop should turn out to be less than seventy-five tons, the buyer would not be bound to accept any portion of it. It is not necessary to consider that question. It certainly cannot be maintained that the same result would follow if the crop of any year should turn out to be more than two hundred tons. At the time of the formation of the contract (to which the inquiry must relate) it could not be known what number of tons would be produced. Even if the fruit had been then ripe and hanging upon the trees it could not be known what portion was to go to the defendant until it was weighed.

In this regard Benjamin gives the following rule:—

"Where anything remains to be done to the goods for the purpose of ascertaining the price, as by *weighing*, measuring, or testing the goods, where the price is to depend on the quantity or quality of the goods, the performance of these things also shall be a condition precedent to the transfer of the property, *although the individual goods are ascertained,* and they are in the state in which they ought to be accepted." (Benjamin on Sales, b. 2, c. 3.)

So far as concerns the proposition that where weighing or measuring is necessary *to the identification* of the goods, the title does not pass until they have been weighed or measured, the American cases are generally in accord with the above rule. (See *Hires* v. *Hurff,* 39 N. J. L. 10; *Galloway* v. *Week,* 54 Wis. 608; *Commercial Bank* v. *Gillette,* 90 Ind. 268; *Hutchinson* v. *Railroad Co.,* 59 N. H. 489; *Fry* v. *Mobile Bank,* 75 Ala. 474; *Allen* v. *Melton,* 64 Tex. 218; *Hubler* v. *Gaston,* 9 Or. 66; 42 Am. Rep. 794; *The Elgee Cotton Cases,* 22 Wall. 180.)

In California the cases are to the same effect. (See *Horr* v. *Barker,* 8 Cal. 608; *McLaughlin* v. *Piatti,* 27 Cal. 463; *Caruthers* v. *McGarvey,* 41 Cal. 15.) Some of the American cases are not in accord with the rule laid down by Mr. Benjamin in this: that *if the goods are*

*identified,* it does not matter that weighing or measuring is necessary to ascertain the price or the quantity. And this seems to be the law in California. For the Civil Code contains the following:—

"Sec. 1140. The title to personal property, sold or exchanged, passes to the buyer whenever the parties agree upon a present transfer, and the thing itself is identified, *whether it is separated from other things or not.*"

This section does not dispense with identification. On the contrary, it requires it. It only dispenses with segregation when the property is otherwise identified. Therefore, where the identification consists in the segregation, weighing, or measuring, they are still necessary. And the present case was of the latter character.

As against these controlling features of the transaction, the plaintiff has only the language of the instrument. The term "sold," it is said, indicates a consummated sale. But this word is not conclusive. (*Anderson* v. *Read,* 106 N. Y. 344, 345.) In *McLaughlin* v. *Piatti,* 27 Cal. 458, the agreement was, that in consideration of a certain sum, the receipt of which was recited, the owner "granted, bargained, and sold" the property to the buyer, yet it was held to be a mere agreement to sell. And in the *Elgee Cotton Cases,* 22 Wall. 180, the language was even stronger.

We think, therefore, that the title did not pass, and that consequently there was no sale, but a mere agreement to sell. Hence the case falls within section 1768, and a warranty that the goods should be sound and merchantable was implied.

2. The court below found that the goods were not sound or merchantable at the place of production, etc. It is contended that this finding is not sustained by the evidence. But we think the evidence is amply sufficient.

S. Roper, who had been in the fruit business for twelve

or fourteen years, and who was shown a sample, testified: "They are not really good for anything. They would not pay to dry. I suppose that animals would eat them."

John A. Emerson, who had been in the fruit and produce business for twenty years, and who had seen a portion of the crop, and was shown a sample while on the stand, testified; "A very few boxes were very good apricots, but the majority of them were very small, very inferior, something that I could not sell unless at a very low figure. . . . . I should not consider those in exhibit H as merchantable."

William Jacobs, who was in the fruit business, and who had seen a portion of the fruit, testified: "They were not even fit for pie-fruit. I would not consider them fit for pulp that we squeeze into jelly. . . . . I say that those apricots that I saw of the crop of 1882 would not be salable to canners in this market or anybody else."

And to the same effect was the testimony of other witnesses who were competent to give an opinion on the subject, and who had either seen portions of the crop or were shown samples of it. The fact that most of the witnesses testified that the fruit might have been used for pie-fruit or for pulp does not help the plaintiff's case. Very inferior fruit may be used for pulp. And it was in evidence that "there is only a small quantity used by canners for pulp. Fifty tons would be enough for the whole city." And that pie-fruit is merely the inferior fruit which is found in most crops. It is not sold as such. Upon the same principle, it might be contended that if the fruit could have been fed to hogs, it had a value, and was, therefore, not within the warranty.

Undoubtedly the testimony of some of the witnesses was toned down on cross-examination, and some of them seem to have had an indirect interest in the question. But the question of credibility was, under our decisions,

for the court below. At the very least, there was a substantial conflict in the evidence.

The fact that the orchard was properly cared for, that the trees were open to the inspection of the defendant, and that it was acquainted with the climatic conditions, etc., seem to us to be entirely irrelevant.

3. It seems to be contended, though not very strenuously, that the defendant accepted a portion of the crop, and that thereby it waived its rights in the premises. The facts in this regard are as follows:—

When the first shipment reached the defendant, it wrote to the plaintiff that the fruit was "by no means of proper quality, nor sound nor merchantable. Yet as these had been allowed to come to the city before we discovered their inferiority and unfitness and unmerchantable condition, and could not have been returned to you except at an entire loss to yourself, we made such disposition of them as we were able to make."

Subsequently the parties entered into a written contract whereby it was agreed that the defendant should send an agent to pick out such portions of the crop as was considered fit to be used. This contract provided that the receipt of the first shipment referred to in its letter above quoted *"shall not be regarded as an acceptance,* and shall not in any manner operate to waive any of the rights of said company"; and further, that the picking out and taking of such portion of the crop as should be picked out by the agent "shall not, nor shall any action hereunder, be deemed or taken to be an acceptance by said company, or a waiver, or to operate in any manner so as to affect, change, or impair the rights, duties, or obligations of either of the parties under said first-mentioned agreement." With reference to the remainder of the crop, the contract contained the following:—

" The remainder of said crop shall be forthwith picked, pitted, and dried in the sun on said premises, by said

Blackwood, *on his own account, and at his own cost and expense*, subject to such rights or obligations with reference thereto as either party may have under said first-mentioned agreement."

The defendant sent its agent to the orchard, and he picked out all of the crop which was considered fit for use. This, together with the first shipment, amounted to eighty-nine thousand pounds, for which the defendant paid at the rate provided for by the first contract. The remainder was dried by the plaintiff, as provided by the second agreement, and the suit is for the price of such remainder at the contract rate, less what the dried fruit was sold for.

We are unable to see that there was any waiver of defendant's rights under the first agreement. It was expressly agreed that the receipt and disposal of the first shipment should not be considered an acceptance. And had it not been for the second contract, the defendant would doubtless not have taken any more of the apricots.

We therefore advise that the judgment and order denying a new trial be affirmed.

FOOTE, C., and BELCHER, C. C., concurred.

The COURT.— For the reasons given in the foregoing opinion, the judgment and order denying a new trial are affirmed.