[Civ. No. 2167. Third Appellate District.—June 8, 1920.]

## A. E. GIANELLI et al., Respondents, v. GLOBE GRAIN & MILLING CO. (a Corporation), Appellant.

[1] SALES — CONSTRUCTION OF AGREEMENT — USE OF WORDS "HEREBY SELL."—A writing reciting that the owners of certain baled hay "hereby sell" the same to a named company, at a specified price "f. o. b. cars or warehouse; same to be decided upon," and setting forth the terms of payment, imports an absolute sale of the hay to the purchaser, and not an executory contract for the sale thereof, and the legal effect of such writing, although signed by both the vendor and the purchaser, is that of a bill of sale.

[2] ID.—PROVISION FOR SUBSTANTIAL PAYMENT ON ACCOUNT—INTENTION OF PARTIES.—The fact that such writing provides that seventy-five per cent of the purchase price shall be paid within four or five days after the execution thereof is a consideration of potent significance in establishing that the transaction was intended by the parties to constitute an absolute sale and that title to the hay should immediately vest in the purchaser.

[3] ID.—WRITTEN AGREEMENT—VARIATION BY PAROL EVIDENCE.—Where parties have reduced the terms of an agreement into which they have entered to writing, all their prior and contemporaneous oral negotiations appertaining to the agreement are to be ordinarily presumed to have been merged in the writing, and the terms of the agreement cannot be varied or changed or modified or even explained by parol testimony.

[4] ID.—USE OF CHARACTERS "F. O. B." — INTENTION OF PARTIES — PAROL EVIDENCE.—Notwithstanding the characters "f. o. b." have a definite and well-understood meaning when used in certain contracts, when they are used in a contract in such manner or in such connection with other words or language therein employed as expressing the terms of the agreement of the parties thereto as to render the intent of the parties to such contract vague and uncertain, parol evidence is admissible, not for the purpose of altering or modifying the terms used, but only to show what the characters "f. o. b.," as therein used, were intended by the parties to mean, or whether they were to control in determining whether the agreement was an executed agreement of sale or only an executory agreement.

[5] ID.—AGREEMENT TO DELIVER GOODS — PASSAGE OF TITLE — INTENTION OF PARTIES.—The fact that the seller of goods or commodities of any character agrees to deliver the same to the purchaser at some point is not necessarily controlling in determining upon a construction of the contract for their sale whether the parties in-

tended by their agreement that an immediate transfer of title should or should not then be effected.

[6] ID.—DAMAGE BY RAIN—LIABILITY OF PURCHASER.—In this action to recover a balance due on the sale price of certain hay under a written contract which recited that the owners "hereby sell" at a specified price "f. o. b. car or warehouse; same to be decided upon," the parol evidence admitted showed that an absolute sale of the hay was effected by the transaction between the parties, and that the title to the hay then and there passed to and vested in the defendant; and, therefore, the defendant was liable for the agreed purchase price for all the hay, notwithstanding a part of it was damaged by rain before delivery was effected.

APPEAL from a judgment of the Superior Court of San Joaquin County. J. A. Plummer, Judge presiding. Affirmed.

The facts are stated in the opinion of the court.

Arthur L. Levinsky and Clarence E. Fleming for Appellant.

Nutter, Hancock & Rutherford for Respondents.

HART, J.—From a judgment in favor of plaintiffs for the sum of $1,590 defendant prosecutes this appeal.

Plaintiffs were the owners of a tract of land, situated near Stockton, upon which, in the season of 1918, they had grown and harvested a crop of hay amounting to 330 tons. The hay was baled and was in one stack on the premises, each bale, with the exception of eighty tons, being tagged with the weight. On August 8, 1918, J. E. Morgan, of Stockton, and G. A. Morgan, of Los Angeles, representing the defendant, called upon the plaintiff, Barmann, and had a conversation with him regarding the securing of an option on the hay or the purchase thereof. Barmann informed the Morgans that he preferred to sell the hay rather than to give an option upon it and, after some conversation, the following contract was written and signed by the parties:

"Stockton, Aug. 8, '18.

"I hereby sell to the Glove Grain & Milling Co. three hundred and fifty ton (350) more or less No. 1 barley hay for twenty-three dollars ($23.00) f. o. b. cars or warehouse;

same to be decided upon. The amount of seventy-five per cent to be paid on or before the 12th of Aug.; the balance of twenty-five per cent to be paid on completion of hauling and delivering, together with weight, on or before sixty days.

"GLOBE GRAIN & MILLING CO.,

"J. E. MORGAN,

"BARMANN & GIANELLI,

"BY H. W. BARMANN."

Six thousand dollars, approximately seventy-five per cent of the purchase price, was paid to plaintiffs on August 14, 1918, and, at the same time plaintiffs assigned to defendant an insurance policy for $7,000 covering the hay. It appears that, on the night of the 11th of September, before the hay had been delivered, half an inch of rain fell and in the next few days there were four inches of rain. The hay was badly damaged and defendant refused to accept any damaged hay, but expressed its willingness to take the undamaged hay. Plaintiffs agreed to haul the undamaged hay if defendant would segregate what it considered damaged from the undamaged hay. This defendant refused to do and plaintiffs commenced the action for the balance of the purchase price.

[1] The controversy herein arises over the question whether the transaction evidenced by the above instrument involved a sale of the hay or an executory contract for the sale of said property, the appellant's position being that, under the terms of said writing, the title to the hay was not to pass to the purchaser until the completion of delivery on board of cars or at a warehouse, to be later designated by defendant; and that, no such delivery having been made, although, as is the claim, notice of and demand for such delivery was duly given and made, the title to the hay remained in the vendors, and that, therefore, they must stand any loss or damage which occurred by reason of the rainstorm referred to. On the other hand, the plaintiffs contend that the transaction constituted an absolute sale of the hay and that title to the property immediately passed to the defendant upon the execution of the writing above quoted herein.

We think the words of the writing evidencing the transaction involved herein clearly import an absolute sale of

the hay and that the legal effect of said writing, although signed by the defendant as well as the plaintiffs, is that of a bill of sale. The instrument sets forth definitely the property sold—that is, the kind and the number of tons of hay sold—and expressly states that the vendors "hereby sell," not "hereby agree to sell," the hay to the purchaser at a specified price. Moreover, the language of the writing, it will be noted, clearly implies that the hay, although thus purchased outright by the defendant, was to remain on the premises of the plaintiffs until such time as the defendant might itself determine whether the hay should be placed or stored in some warehouse designated by it or put on board of cars for shipment. This matter was solely to be determined by the defendant, and it is obvious that the hay could not be delivered until the defendant had made a decision as to which of the two different places provided for in the writing at which it should be delivered for it by the plaintiffs. Indeed, the plaintiffs were without any right or authority to deliver the hay except at one or the other of the places to be finally designated by the defendant, although the former could have compelled the latter to remove the hay from their premises if it had been permitted to remain there for a longer period than was consistent with the convenient use by the plaintiffs for their own purposes of the particular portion of the premises where the hay was allowed by them to remain after the transaction and pending its delivery to the place designated by the defendant.

[2] There is still another consideration of potent significance in establishing that the transaction was intended by the parties to constitute an absolute sale and that title to the hay should immediately vest in the defendant, and that is in the fact that the writing above reproduced herein provided that a very large proportion of the purchase price —in fact, the larger proportion thereof—should be paid within four or five days after the execution of the instrument. It is not at all likely that, had the contract been intended or understood to be merely executory and its consummation dependent upon delivery of the hay by the sellers to the purchaser, the defendant would have bound itself to pay three-quarters of the purchase price within so short a time after the transaction and before (as we

shall later see was true) the place of delivery was designated by the defendant. Referring to the circumstance of the payment down of a large amount of the purchase price of personal property as one shedding some light on the nature of the contract involving a transfer of such property —that is, upon the question whether the contract involves an absolute sale or is only executory—Williston, in his work on "Sales," 1909 edition, page 368, says: "If the buyer pays the price, or a large portion of it, it is evidence not so strong as delivery, but still entitled to great weight, that immediate transfer of the property is intended. The weight to be given such evidence will be diminished if the portion of the price paid is not large. It is to be observed that though payment of the price is important evidence of an intention to transfer the property immediately, nonpayment of the price is little, or no evidence, of an intent to retain the ownership."

But if there be doubt as to the scope and effect of the writing or as to whether it was intended as an executed or only an executory contract or one merely for the sale in the future of the hay, such doubt will be readily dissipated upon a consideration of the parol evidence allowed by the court, disclosing the facts and circumstances leading to, surrounding, and attending the execution of the writing. But in this connection, we may first well consider the contention of counsel for the defendant that evidence extrinsic to the writing itself is incompetent and, therefore, inadmissible for the purpose of showing what the parties meant or intended by their agreement. [3] This position is based upon the well-established rule that, where parties have reduced the terms of an agreement into which they have entered to writing, all their prior and contemporaneous oral negotiations appertaining to the agreement are to be ordinarily presumed to have been merged in the writing and that the terms of the agreement cannot be varied or changed or modified or even explained by parol testimony.

[4] The specific contention is that the characters "f. o. b." as used in contracts for the sale of personal property are in commercial circles always understood to mean that title to the thing which is the subject of such a contract does not pass until the thing or property is delivered by the seller to or on board the cars, or, as in this case, until so

delivered either at a warehouse or on board the cars. In other words, it is the contention that those letters or characters as used in commercial contracts for the sale of goods or commodities have a definite, fixed, and well-understood meaning, that their signification as so used is as above given, and that, therefore, there cannot properly be admitted to prove the meaning of those characters or to show that, as used in a particular contract, they do not mean what they are in the law-merchant commonly understood to mean when so employed, any testimony other than the agreement itself, but that the courts may and must take notice of their meaning or signification when so used. Some cases from other jurisdictions are cited as in support of this view. Without entering into an examination herein of the cases named by counsel, we affirm only an obvious proposition when we observe that words or characters having a definite and well-understood meaning when used in certain contracts may nevertheless be used in a contract in such manner or in such connection with other words or language therein employed as expressing the terms of the agreement of the parties thereto as to make such contract itself ambiguous or uncertain as to its meaning, scope, and effect, or, in other words, render the intent of the parties to such contract vague and uncertain; and where the intention of the parties to a written contract is not made clear by the written instrument itself or is so obscured by the language of the writing, even though phrased in words which themselves, or taken alone, bear a fixed, definite, certain, and a common and well-understood meaning, it is proper to receive evidence for the purpose of explaining what the parties meant by the language employed in such contract to express their agreement. In this case, the parties appear from the face of the writing itself to have "struck a bargain" by agreeing upon a sale of the hay and the terms of the payment therefor, but they, notwithstanding, inserted in their written agreement the characters "f. o. b.," in a connection which might possibly have the effect of throwing a little—we think very little, if any—doubt upon what they really intended to effect by their agreement. It was proper, therefore, to allow parol evidence for the purpose of bringing before the court all of the facts and circumstances characterizing the transaction culminating in the agreement and the writing evi-

dencing its terms, not for the purpose of altering or modifying the terms thereof, but only to show what the characters "f. o. b.," as therein used, were intended by the parties to mean, or whether they were to control in determining whether the agreement was an executed agreement of sale or only an executory agreement for the sale of the hay.

[5] It has repeatedly been held in this state that the fact that the seller of goods or commodities of any character agrees to deliver the same to the purchaser at some point is not necessarily controlling in determining upon a construction of the contract for their sale, whether the parties intended by their agreement that an immediate transfer of title should or should not then be effected. In *Bill* v. *Fuller*, 146 Cal. 50, [79 Pac. 592], the agreement provided for payment for the oranges, which were the subject of the contract, "as soon and at the time of delivery." In that case the trial court allowed parol proof to show what the parties understood and intended that the nature of the contract should be—that is, whether it involved a present sale and transfer of title or merely an agreement to sell, with the intention that title in the vendee should vest only upon delivery by the vendor. It was held that the trial court made no error in admitting the evidence thus referred to; and, furthermore, the court held in the language following this, that the contract upon its face clearly indicated that an absolute sale was thereby effected: "Nor do we wish to be understood as holding that the title to the crop did not pass as soon as the contract was executed. The agreement in form imports a present sale; the thing sold was in existence and was identified and separated from other things. Under section 1141 (1140?) of the Civil Code, it would seem that title passed at once, and that the oranges remained on the tree at the risk of the buyer."

In *Fiddyment* v. *Johnson*, 18 Cal. App. 339, [123 Pac. 342], the agreement involved the sale of hay and the facts of the transaction therein are so near identical with those of the present case that it would be difficult to differentiate the two upon any logical line of demarcation. It was there held that the fact that the seller was required by the contract to deliver the hay was not controlling, citing *Dyer* v. *Libby*, 61 Me. 45, where the seller was to haul and deliver at a specified point, which was held not a controlling

factor determinative of the question whether the contract involved an executed or present sale and transfer of title to the vendee or merely executory in its nature. (See, also, *Greenbaum* v. *Martinez,* 86 Cal. 459, [25 Pac. 12].)

It is held in all of the above cases that whatever may be the general trade meaning of the phrase "payable f. o. b." or other trade phrases peculiar to commercial contracts or the characters "f. o. b.," the fact remains that such trade or commercial signification or meaning is always controlled by the express contract of the parties; and that parol evidence may be received to show what effect such phrases or characters have on such contracts as in fixing the nature, scope, or effect thereof, or as in disclosing the intention of the parties as to such scope and effect.

It follows from the foregoing considerations that the action of the trial court in allowing parol evidence of the circumstances attending the making of the agreement involved herein was free from error; and, as before declared, a consideration of the evidence so admitted will readily demonstrate that the said agreement or contract involved an absolute sale of the hay and that, therefore, the title to said property passed to the defendant *eo instanti* upon the execution of said agreement. The testimony so referred to was (for the plaintiff) mainly that of H. W. Barmann, one of the plaintiffs, and is as follows, given synoptically, though somewhat extendedly: "A. E. Gianelli, the other plaintiff, and myself own a tract of land situated about four miles west of Stockton on the lower division of Roberts Island. In the season of 1918 we grew and harvested a crop of hay on this land. This hay was harvested, baled, and stacked in one large stack on the premises adjoining the Jacobs or Holt Road. Every bale was weighed as it came from the hay-press on the field and every bale, with the exception of eighty tons, was tagged. On the eighth day of August, 1918, there were 330 tons of hay in the stack, less one-fifth of a ton. It was separated from everything else. On that day Mr. J. E. Morgan, of Stockton, and Mr. G. A. Morgan, of Los Angeles, called upon me in regard to selling my hay. We talked for about half an hour. No one else was present. Mr. Morgan's wife was in his automobile but she did not enter into our conversation. Both of the Mr. Morgans and I looked at the hay; they examined it

very carefully, asked me as to its quality and uniformity in the stack, and so forth. They both seemed to be very much pleased with the quality of the hay. They told me that the United States government was opening bids for the purchase of a large· quantity of hay, on the following Monday, I believe, and asked me if we would be willing to give them an option for the purchase of this hay. I told them that I didn't think so, that an option would not be satisfactory to me. I felt that the hay was to be sold outright to avoid any damage—any possible damage from rain or otherwise. We spoke of what the hay would bring. As we were speaking of the price the point came up as to whether I could deliver the hay for them. I told them I didn't want to deliver the hay because it was a lot of bother, and I wanted to sell it as it was and not be bothered with it. They told me that they had no organization to look after such things as hauling hay, and so forth, and could, not be bothered with the same. I consented and said that in that event I could probably deliver the hay to them. It was agreed that the price to be paid for the hay was twenty-three dollars a ton, which would net me practically twenty-two dollars a ton, inasmuch as the hauling would cost one dollar a ton. We then spoke of payments. We spoke as to how much money we would want, or I would demand at that time. I told them I would need most of the money at that time. They asked me if seventy-five per cent would be sufficient and meet our needs at that time, that being about the sum of $6,000. I said yes, I thought that would be satisfactory for the initial payment, and as to the other payment they asked me if sixty days from date would be all right for the second payment, in case they did not haul the hay before that time. *Mr. Morgan asked me if they could leave the hay on the ranch for a period longer than sixty days in case they wished. I told them it made no difference to us, they could leave the hay there until next winter, and we would· not charge them storage for the same provided we didn't need the land or the space.* That being agreed upon Mr. Morgan from Los Angeles, instructed his brother to draw up a bill of sale for the hay.''

Thereupon the writing evidencing the agreement of the parties and above quoted herein was prepared by one of the Morgans and signed by both the parties to the transac-

tion. The witness (Barmann), continuing further, testified: "The next time I saw Mr. Morgan was on the 14th of August. Inasmuch as the payment of seventy-five per cent on the purchase price was due on the 12th of August by the terms of the bill of sale, I went to the office of Morgan & Miller on the 14th of August to get the seventy-five per cent payment for the hay. Mr. Morgan at that time wrote out a check payable to our order for $6,000 and gave me the same. He also asked me to have the insurance assigned to them inasmuch as they had bought the hay, which I told him I would do. The hay was insured for about $7,000. I then went to the Bank of Italy and deposited our check for $6,000. I went to Mr. Wurster and asked him for the policy. Mr. Wurster gave me this insurance policy which we had had at the Bank of Italy. I took the insurance policy and started over to Gianelli's office. I met Mr. Morgan on the sidewalk in front of the Bank of Italy and told him it had been made out for about $7,000 and asked him if he wanted more insurance on the hay. He said no, that sum would be all right. I delivered the policy to Mr. Truett and he in turn assigned the policy to the Globe Grain & Milling Company and the policy was delivered to the Globe Grain & Milling Company. I saw Morgan & Miller once or twice before the 31st of August, and asked them if they had been successful in selling this hay to the government, and as to when they would want the hay hauled."

Barmann stated that on the thirty-first day of August he called on and saw Morgan, and said to him that they (the plaintiffs) having finished hoeing their beans, they then had nothing to do and would like very much to remove the hay from the ranch. Morgan replied that he was writing to Los Angeles and hoped that "they could move it very soon." The next time the witness saw Morgan was on the eleventh day of September, at about 5 o'clock in the afternoon at his (Morgan's) office, and at that time Morgan instructed the witness to deliver the hay to the Dickinson-Nelson Warehouse in Stockton "and that we could start hauling." Morgan said to Barmann that one Hickey desired to secure the work of moving the hay, and both Morgan and the witness thereupon went together to the office of Hickey. The witness continued: "I asked Mr. Hickey what he would charge

to haul this hay to the warehouse in Stockton and he told me it would cost one dollar a ton to deliver the same. I wanted to see several other parties regarding the hauling and went to Russell Brothers to see them. They had gone home so I went to the office of Russells the next morning at 8 o'clock and saw Mr. Russell. It was then raining. It had rained half an inch on that night of the 11th of September. Russell told me he was very busy and he would rather I would have Hickey haul it. I went to Hickey's office and as he was not in I wrote a note telling him to haul the hay as soon as possible. It then rained about four inches in the next few days. I saw Mr. Morgan on the morning of September 12th and told him I had seen Mr. Hickey and had told Hickey to haul the hay and I told Morgan in case he saw Hickey before I did to tell Hickey 'to commence hauling the hay.

"I saw Mr. Morgan again on September 13th and we talked over about the rain and so forth, and Mr. Morgan said it was not advisable to haul the hay until things dried off. On the following Monday, September 16th, I was out on the ranch and got on top of this stack of hay and examined it by taking a couple of bales from the top to see how far the moisture had penetrated the stack of hay. At that time the moisture had gone through at least two bales—the top two bales—two layers of hay were saturated with water. I telephoned Mr. Morgan and told him that the hay was very wet and told him that in case I owned the hay I would remove the two bales which were saturated with water to prevent the same from percolating through the whole stack. Mr. Morgan came out and looked at the hay and told me to remove the top two bales of hay from the stack and pile the same to one side. That same evening, about 5 o'clock, I went to Mr. Morgan's office in Stockton again, and told him that inasmuch as he had instructed me to move the top bales off, and so forth, I told him I wanted him to give me a statement of that part, in writing. Mr. Morgan told me he could not give me anything in writing without taking the matter up with the Los Angeles office. I therefore went to the office of Mr. Morgan on the morning of September 17th and asked him for the order. He told me he could not give me this in writing. Mr. Morgan instructed me to haul the good hay which had not been

damaged. I therefore arranged with Mr. Hickey to have trucks down there at once to haul the hay which had not been damaged and notified Mr. Morgan of the same. . . .

"On the 17th, I have this on September 17th—I have this memorandum in my handbook: 'Morgan instructs me to start hauling hay which is undamaged, but will not give order to remove wet hay from stack to find further damage! . . . "

The testimony of Barmann was corroborated in all material particulars by that of J. E. Morgan, who, testifying for the defendant, declared that the former first said they would let the defendant have an option on the hay at twenty-three dollars per ton, to which proposition the brother of J. E. Morgan replied that it was not advisable to take an option, but that it would be better "to take the hay as long as we could get the time for storing or loading the hay out. We told Mr. Barmann," Morgan continued, "we would let him have what money he needed as an advancement on the hay. He spoke about getting about three-quarters of the approximate weight, which was about 350 tons, or, in other words, about $6,000, which was satisfactory."

[6] That the foregoing testimony unmistakably shows that an absolute sale of the hay was effected by the transaction between the parties, and that the title to the hay then and there passed to and vested in the defendant, there is no reasonable ground for doubting. The parties agreed to a present transfer, and the property which was the subject of the agreement was itself identified, being separated from all other hay or "things." When those conditions arise and exist, a sale and the transfer of title to the thing sold are effected. (Civ. Code, sec. 1140; *Blackwood* v. *Cutting Packing Co.,* 76 Cal. 212, [9 Am. St. Rep. 199, 18 Pac. 248]; *Lassing* v. *James,* 107 Cal. 348, [40 Pac. 534]; *Scribner* v. *Schenkel,* 128 Cal. 255, [60 Pac. 860].) "When the terms of sale are agreed on, and the bargain is struck, and everything that the seller has to do with the goods is complete, the contract of sale becomes absolute, without actual payment or delivery, and the property and risk of accident to the goods vest in the buyer." (2 Kent's Commentaries, p. 492; *Browning* v. *McNear,* 158 Cal. 525, [111 Pac. 541].) Here, as we have seen, everything that the plaintiffs had to do with the hay after the transaction

or before its execution was complete, except that, *when called on to do so by the defendant,* they were to deliver the hay to some place designated by the latter. The proportion of the purchase price as agreed upon and specified in the written contract was paid by the defendant to the plaintiff at the time designated in said contract and before any of the hay was delivered. Furthermore, the plaintiffs, at the request of the defendant, assigned to the latter the policy of insurance previously issued to and taken out by plaintiffs to indemnify them against loss in case of the destruction of the hay.

The fact, manifestly, is that the contract here involved was, in a technical or strictly legal sense, a bargain and sale, as known to the common law; for, as we have pointed out, the evidence unquestionably shows that everything was done that the plaintiffs were required to do with the hay, except the delivery thereof, which act rested entirely with defendant. In other words, upon reaching an agreement as to the terms of the convention by the parties, a bargain having thus been struck, title to the hay necessarily and immediately passed to the defendants. It was, in brief, under the evidence and under the law (sec. 1140, Civ. Code), clearly an executed and not an executory agreement or contract (see Benjamin on Sales, 4th ed., pp. 309, 310; *Johnson* v. *Dixon Farms Co.*, 29 Cal. App. 52, 57, [155 Pac. 134, 136].)

The conclusion from the foregoing views is necessarily that "the title and the risk of accident" to the hay vested in the defendant upon the completion of the transaction evidenced by the writing to which the parties subscribed and which is above reproduced herein, and that the findings of the court are well supported and that they likewise support the judgment.

The judgment is affirmed.

Nicol, P. J., *pro tem.,* and Burnett, J., concurred.