[Civ. No. 12483.   First Dist., Div. One.   Apr. 14, 1944.]

SOUTHERN PACIFIC COMPANY (a Corporation), Appellant, v. HYMAN-MICHAELS COMPANY (a Corporation), Respondent.

A. A. Jones, Wm. Meinhold and A. T. Suter for Appellant.

Cooley, Crowley & Supple for Respondent.

KNIGHT, J.—The plaintiff, Southern Pacific Company, sued to recover demurrage charges claimed to be due on 365 freight cars containing scrap iron purchased by defendant from plaintiff for overseas shipment. The cause was tried by a jury, and it returned a verdict in favor of the defendant. Plaintiff appeals from the judgment entered upon

the verdict and from the order denying its motion for judgment notwithstanding the verdict.

The main grounds urged for reversal are that there was no contested issue of fact to be submitted to the determination of the jury; that the evidence established as a matter of law that the demurrage tariffs imposed by plaintiff applied to the factual situation presented, and that therefore the trial court erroneously submitted the cause to the determination of the jury; and that in any event the evidence introduced does not support the verdict. The points made by plaintiff in this behalf are not sustainable.

The circumstances out of which the controversy arises are these: For many years the defendant company was engaged in the business of purchasing large quantities of scrap iron from the western railroads for sale and shipment overseas through the port of San Francisco; and throughout the three-year period immediately preceding March, 1940, it purchased several hundred carloads from plaintiff, which defendant sold and exported to Japan. The price paid for the scrap iron by defendant included transportation "f.o.b." Southern Pacific tracks, San Francisco. All but two of the cars here involved were loaded at plaintiff's store yards in Oakland, Sacramento, and El Paso, and the waybills, made out by plaintiff as seller and shipper, named Southern Pacific Company as consignee, care agent for defendant, in care of a certain steamer at a designated dock. However, the Southern Pacific tracks end at Second Street and the Embarcadero; it owns no trackage along the San Francisco waterfront. All of it is owned and controlled by the Belt Line, a state railroad over which the state operates its own engines and switching crews. Consequently, in order to place the scrap iron alongside the ships to be loaded, it was necessary that the loaded cars be transferred to and taken over by the Belt Line at the end of the Southern Pacific tracks and spotted on the docks alongside the ships. The Belt Line had an established rule, which was well known both to plaintiff and defendant, that it would not take over any cars containing overseas shipments unless the ships that were to receive the cargo were not only docked but ready and free to take the cargo. The purpose of the rule was to prevent congestion on the limited trackage along the waterfront; and the delay which is the basis of the demurrage charges herein was brought about by the refusal

of the Belt Line to take over the cars immediately upon their arrival. The reason for the refusal was that the material could not be loaded on the ships. Of the total sum of $4,686.30 which plaintiff sought to recover as demurrage, $2,996.40 was claimed to be due on cars containing scrap iron to be exported on the "S.S. Spyros" which had been picketed at the dock by the Chinese in protest against the scrap iron being sent to Japan; other ships were picketed in the same manner and for the same reason, but for shorter periods. The other delays arose from inability to foretell exactly when the ships on which the material was to be exported would arrive in San Francisco, or when after arrival they would be ready and free to load. Therefore, until the Belt Line was ready and willing to accept the transfer of the cars to its tracks, they remained unloaded on the Southern Pacific tracks at its Bayshore freight yards, just outside of the municipal limits of San Francisco, and thereupon they were moved by the Southern Pacific, without charge to defendant, from its Bayshore freight yards to the point of transfer and turned over to the Belt Line.

The demurrage tariffs assessed and sought to be collected are set forth in a schedule filed by plaintiff with and sanctioned by the California Railroad Commission and the Interstate Commerce Commission, and in cases where such tariffs apply the "free time" permitted thereunder for unloading after notice of arrival is 48 hours. The parties are agreed, however, that published railroad tariffs, whether for movement of goods or for demurrage, by their very nature, may be assessed and collected only when a shipper-carrier relationship exists; that is, when the railroad is acting as a carrier of the goods of another, and that they have no application to the transportation by the railroad of its own property. Hence there is no legal ground upon which it may be held that the car demurrage tariff in and of itself imposes liability on a purchaser from a railroad while the subject of the sale remains the property of the railroad and has not been delivered actually or constructively to the purchaser.

The general rule is that the question of when title to goods sold passes from the seller to the buyer is one of intention between the parties (*Blackwood* v. *Cutting Packing Co.*, 76 Cal. 212 [18 P. 248, 9 Am.St.Rep. 199] ; *Gopcevic* v. *California Packing Corp.*, 64 Cal.App. 132 [220 P. 1078]), and in the present case that issue was a disputed one. Plain-

tiff's theory was that the passage of title and constructive delivery occurred as soon as the cars were placed on the "hold" track at the Bayshore freight yards and notice of arrival thereof given to defendant; whereas defendant claimed that it was the intention of the parties that the title would remain in plaintiff until defendant was able to take over the material for loading purposes on the ships to which the material had been consigned by the waybills, which meant, at the earliest possible time, when the cars were turned over to the Belt Life by the Southern Pacific Company at the point of transfer. Section 1739 of the Civil Code provides that "Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer. . . . Rule 5. If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon." And section 1738 of the same code provides: "(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred. (2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case." Furthermore, it is held that it is proper under certain circumstances to allow parol evidence for the purpose of bringing before the court all of the facts and circumstances characterizing the transactions culminating in an agreement and the writings evidencing its terms, not for the purpose of altering or modifying the terms thereof but only to show what the intention of the parties was with respect to the terms used therein. (*Gianelli* v. *Globe Grain & Milling Co.*, 48 Cal.App. 103 [191 P. 720].) ▮ In the present case the evidence shows the following with respect to the making of the contracts and the movement of the cars: In some instances an employee of plaintiff telephoned defendant that scrap iron was available for purchase by defendant, in others an employee of defendant would telephone plaintiff asking whether it had scrap iron on hand. The terms of sale were discussed on the telephone. Defendant would then send plaintiff a purchase order

on one of defendant's regular forms used generally by it in making purchases. Plaintiff's Exhibit 5 was introduced as typical of these orders. Beneath the figures which appear in the price column is typed "fob your tracks San Francisco or Los Angeles." There also appears in typewriting "Shipping instructions will be furnished you later." On this exhibit there is also, in handwriting, "Fob Cars SP Tks San Fran"; and the provision "Shipping instructions will be furnished you later" is interlined as follows: "~~Shipping~~ instructions ~~will be~~ To Follow ~~furnished you later.~~" Plaintiff's witness Keane, supervisor of sales in plaintiff's purchasing department, testified that these penciled notations were made by him, after the order was received, for use of a stenographer in writing up plaintiff's record of the transaction. Two of the carloads were sold pursuant to a request for bid on material for sale sent out by plaintiff. These forms called for an offer on a sale "F.O.B." followed in typewriting by the provision—"CARS—S.P. Tracks SAN FRANCISCO." When this form was used defendant did not send in one of its regular purchase orders. Thereafter the defendant gave shipping instructions upon each order by letter, or thus confirmed instructions given over the telephone. It was agreed on the trial that plaintiff's Exhibit 6 is typical. It provided: "This material is to be consigned to Hyman Michaels Company, c/o SS NORWAY MARU, Pier 45, San Francisco, expected to commence loading January 22." Upon the receipt of the shipping instructions the scrap iron was loaded into cars at plaintiff's store yards and carried to San Francisco over plaintiff's tracks under a non-revenue "Waybill for Company Freight" made out by the railroad company. Exhibit D is a typical waybill. It includes the following: "Consignee S. P. Lines c/o agt for Hyman Michaels c/o S.S. Eidevold Pier 45." With a few exceptions the cars containing the scrap iron arrived in San Francisco by the date the vessel was expected to commence loading as given in the shipping instructions. All of plaintiff's freight trains entering San Francisco go first to plaintiff's Bayshore freight yards, where they are broken up. If steamship orders for overseas shipments had been received, the cars containing the shipments would be moved from the Bayshore yard to the place where plaintiff's tracks meet those of the Belt Line, and thence taken by the Belt Line to the dock. If steamship orders had not been received, the cars containing

overseas shipments would be placed on the "hold tracks" in the Bayshore yard to await a steamship order. As noted above, the Belt Line would not accept cars for the docks until the steamship company had given its order or notice indicating that it would load. When the steamship order was received by plaintiff a "drag list" was made up of cars to be sent to the Belt Line and the cars were then moved by plaintiff to the transfer point. Under plaintiff's schedule of tariffs as filed it was required to make a charge of 50 cents per ton for the movement of all "revenue freight" (not owned by plaintiff) from Bayshore to the Belt Line; but plaintiff made no charge for moving the cars in question here from its Bayshore yards to the point where its tracks connect with the Belt Line, nor were any waybills issued therefor covering this haul. The regular tariff for movement over the Belt Line tracks to the docks was paid by defendant.

The evidence also shows another written provision to which all sales were subject and which must be considered in the determination of the question of the passing of title and delivery. In this respect plaintiff's witness Keane, supervisor of sales in the purchasing department, testified unequivocally that although plaintiff's form request for bid on material for sale was used only for two carloads, it was understood that all sales were subject to its terms unless contrary conditions were agreed upon; and paragraph 9 of the terms and conditions of that form is as follows: "Seller shall not be obligated to deliver, or Buyer obligated to receive, the property purchased hereunder, when and while, and to the extent that Buyer is prevented from receiving, or Seller from delivering, by act of God, fire, *strike*, partial or total interruption, or loss or shortage of transportation facilities, commandeering of raw materials, products, plants or facilities or by any other similar or different acts of civil or military authorities *or by any cause beyond the control of Seller or Buyer*, whether similar to the causes herein specified or not." (Italics added.)

Furthermore, defendant introduced the testimony of an expert witness whose qualifications were not questioned, from whose testimony it is apparent that the "non-revenue" waybills such as plaintiff here used in consigning the scrap iron to itself, care of the ship on which it was to be exported, were used only in cases of transportation of the railroad company's own property.

From the foregoing it is quite obvious that the determination of the issue of whether the demurrage tariffs sought to be imposed applied to the situation here presented depended upon the question of when and where title to the scrap iron passed from plaintiff to defendant, and it is apparent that under the circumstances this was a question which was properly submitted to the determination of the jury; it is further apparent that the facts and circumstances above narrated and the fair inferences to be deduced therefrom are legally sufficient to support the implied finding of the jury on that issue.

Plaintiff attaches much significance to the use of the term "f.o.b." Southern Pacific tracks, San Francisco, contending in effect that it is in itself proof that title passed when the cars reached the Southern Pacific tracks in San Francisco. It has been held, however, that while the expression "f.o.b." signifies generally an intention to pass title, such meaning is not conclusive on that question. (*Gopcevic* v. *California Packing Corp., supra; Gianelli* v. *Globe Grain & Milling Co., supra.*) In the latter case the court after reviewing several earlier decisions went on to say: "It is held in all of the above cases that whatever may be the general trade meaning of the phrase 'payable f.o.b.' or other trade phrases peculiar to commercial contracts or the characters 'f.o.b.,' the fact remains that such trade or commercial signification or meaning is always controlled by the express contract of the parties; and that parol evidence may be received to show what effect such phrases or characters have on such contracts as in fixing the nature, scope, or effect thereof, or as in disclosing the intention of the parties as to such scope and effect."

It is true that in the present case no oral testimony was produced concerning the meaning of the term "f.o.b"; but when its use is considered in the light of the other facts and circumstances hereinabove set forth, it reasonably may be construed as meaning merely that the purchase price of the scrap iron was fixed on the basis that plaintiff would transport it free of charge from the places where it was loaded into plaintiff's cars to plaintiff's tracks in San Francisco and not beyond; and that the expression was not used as indicating the point of the passage of title. (*American Factors, Ltd.* v. *Goss*, 72 Cal.App. 742 [238 P. 121].)

Plaintiff argues that the question of whether the

demurrage tariffs sought to be collected applied to the factual situation here presented was one of law and as such should have been passed upon by the trial court. The record shows, however, that the trial court did pass upon that question, first in denying plaintiff's motion for a directed verdict, and again in denying plaintiff's motion for judgment notwithstanding the verdict; and the state of the evidence shows that the trial court was justified in so ruling. It is true that through the medium of an instruction practically the same question was submitted to the jury as an issue of fact. However, there was no error in so doing, for as already pointed out the controlling element involved in that issue was the passage of title, and since the determination of that question rested largely on the intention of the parties, it was doubtless a jury question.

After testifying at some length in explaining the operation of railroad tariffs and the meaning of certain technical terms employed therein, defendant's expert witness was permitted, over plaintiff's objection, to give his opinion that the tariffs did not apply to a situation of the kind here presented. Assuming that the objection should have been sustained, it would appear that the negative answer given by the witness cannot be deemed prejudicial, for as stated by the witness, his opinion was based entirely upon the fact, which both sides here agree upon, that the tariffs in question do not apply to cases where the railroad company is transporting its own property.

Plaintiff further contends that in any event judgment for some amount should have been entered in its favor, since the sum for which it sued admittedly included in some instances demurrage charges for the time the cars were detained after transfer to the Belt Line and before they were unloaded at the dock, for which defendant conceded liability at the trial. However, plaintiff made no attempt whatever to show what portion of its claim was for demurrage on the Belt Line, nor on this appeal does it state the amount it claims thus to be due. In fact at the conclusion of the trial plaintiff's counsel stated that it would be difficult to stipulate as to the matter because in some instances there was delay both in the Bayshore yards and on the Belt Line. In that

state of the record there is no way in which this court can make the segregation.

The judgment and order appealed from are affirmed.

Ward, J., concurred.

PETERS, P. J.—I concur. I agree that, if the question presented on this appeal presents a question of fact, the evidence supports the implied finding of the jury that title to these goods did not pass until they were delivered to the Belt Line Railroad. Indeed, in my opinion, a finding to the contrary would not be supported.

As the main opinion points out, appellant urges that the question of when title passed was a question of law and not of fact and should not have been submitted to the jury. There may be merit in this contention. It seems to be the rule that where the construction of a contract is involved, and there is either no extrinsic evidence or such evidence is uncontradicted, the question of construction is one of law. But it does not follow that submitting such a question to the jury was necessarily prejudicial to appellant. Under the circumstances above outlined, it is the duty of the appellate court to interpret the contract independent of the construction given to it by the trier of the fact, and to make a final determination of the controversy in accordance with the applicable principles of law. (*Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825].) If this question is one of law, and I am inclined to believe it is, it seems to be that the reasonable construction of the contract is that the parties intended title to pass only upon delivery to the Belt Line. Since this is in accord with the determination of the jury, it is obvious that whether the question is one of fact or law, since both reach the same result, no prejudice can have been suffered by treating it as a question of fact, even though it be a question of law.

Treating the question as one of law, it seems to me that the only reasonable construction of the contract of the parties, and of the uncontradicted evidence, is that they intended title to pass only upon delivery to the Belt Line. The phrase "fob your tracks San Francisco" is admittedly ambiguous as to the exact time of passage of title. But there are other provisions of the contract which clearly disclose the intent of the parties. As pointed out in the main opinion, the way-bills designated the Southern Pacific Company as consignee

in care of a designated steamer at a designated dock, and both parties had in mind the possibility of delay and they expressly provided that the buyer was not obligated to accept delivery when such delivery was delayed by reason of any cause beyond the control of the buyer. There are the other provisions of the contract and other evidence, quoted at length in the main opinion, that lead to the same conclusion. There is one other factor, not emphasized in the main opinion, that unequivocally shows the intent of the parties. The goods were held by plaintiff at the Bayshore yards. If title had passed to the goods, the company was obligated to charge the respondent not only demurrage, but also for the transportation of the goods from the Bayshore yards to the Belt Line. The Southern Pacific Company has a regularly published tariff for such a haul. It is a most serious offense, under both state and federal law, not to charge a tariff required to be charged by law. Yet when the appellant shipped these goods from the Bayshore yard to the Belt Line they only attempted to charge demurrage, and did not attempt to charge for the transportation of the goods to the Belt Line. This demonstrates to a certainty that appellant itself interpreted the transaction as one not requiring the payment by respondent of the tariff from the Bayshore yards to the Belt Line. It follows that appellant itself interpreted the transaction as one where title did not pass until delivery to the Belt Line. Inasmuch as appellant has itself interpreted the phrase f.o.b. plaintiff's tracks San Francisco as imposing upon it an obligation to transport the iron to the Belt Line without charge to respondent, and inasmuch as such obligation is only consistent with retention of title by appellant until that time, it seems obvious that appellant has, in effect, admitted that title did not pass until the goods reached the Belt Line. Such contemporaneous construction is entitled to great weight. (*Johnston* v. *Landucci,* 21 Cal.2d 63, 70 [130 P.2d 405, 148 A.L.R. 1355]; *Keith* v. *Electrical Engineering Co.,* 136 Cal. 178 [68 P. 598].)

For these reasons I concur in the order affirming the judgment.

A petition for a rehearing was denied May 13, 1944, and appellant's petition for a hearing by the Supreme Court was denied June 12, 1944.