[Civ. No. 1013.  Second Appellate District.—November 23, 1911.]

## HARRY H. KENNEY, Appellant, v. C. P. GROGAN, Respondent.

SALES—OLIVE CROP ON TREES—DELIVERY BY VENDOR—PASSING OF TITLE.
Where a contract for the sale of an olive crop growing on the trees
of the vendor, which was nearly ripe and about full grown, provided
that the vendor should pick the same when fully ripe, and ship them
at specified rates per ton, payable one-half on demand when deliv-
ered and the remaining one-half thirty days after delivery, the con-
tract is not to be interpreted as passing the title to the crop on the
trees, but under the conditions specified, the title to the olives did
not pass until delivery was made.

ID.—ABSENCE OF IMPLIED WARRANTY.—Under section 1764 of the Civil
Code, a mere contract of sale or agreement to sell does not imply a
warranty, except as otherwise provided.  There was no implied war-
ranty as to the olive crop as "nonexistent," under section 1768 of
that code, nor as "inaccessible to the examination of the buyer,"
under section 1771 of the same code.  It is held that the testimony
showed, without contradiction, that the contract related to olives in
existence on the trees nearly ripe, where they could be observed at
any time, and that they were at no time inaccessible to the buyer.

ID.—RULE OF CAVEAT EMPTOR APPLICABLE.—Under the common-law rule,
as well as under the facts of this case, as applied under our statutes,
the rule of *caveat emptor* would apply, and no warranty would be
inferred for the benefit of the vendee.

ID.—CROP DELIVERED NOT UNMERCHANTABLE—FINDING UNSUPPORTED.—
It is held that under the testimony, the court was not justified in
finding that the olives delivered were of unmerchantable quality, but
that the most that can be said of defendant's claim in this regard
is that while the olives sold were capable of being manufactured
into olive oil, the quality of the oil was of an inferior grade, but
that it could be sold for a dollar a gallon.  There is nothing in the
contract to show that any special grade or quality was expected to
be furnished.  The contract referred only to the state of ripeness of
the olives when picked.

ID.—DEFINITION OF "MERCHANTABLE" GOODS.—The requirement, when it
exists, that goods shall be "merchantable," does not make it essen-
tial that the goods shall be of first quality, or even that they shall
be as good as the average of goods of the sort.  If there is no war-
ranty of fitness for a particular purpose, the buyer cannot claim
more than that the goods, with their defects known, shall be salable
as goods of the general kind which they were described to be when
bought.

ID.—TERMS OF SALE NOT MODIFIED BY AGREEMENT.—Where the terms of sale were not modified by agreement, the plaintiff is not bound to accept the proceeds of the oil manufactured by defendant from the olives sold and delivered under the contract, in lieu of payment therefor according to the terms of the contract.

APPEAL from an order of the Superior Court of Los Angeles County denying a new trial. Frederick W. Houser, Judge.

The facts are stated in the opinion of the court.

Geo. S. Richardson, and Geo. P. Adams, for Appellant.

Geo. S. Hupp, for Respondent.

JAMES, J.—In this action plaintiff had judgment for an amount of money which constituted only a small part of the sum demanded. He appeals from an order denying his motion for a new trial.

On November 26, 1909, the plaintiff, who was the owner of an olive orchard located at Sespe, in the county of Ventura, California, made a contract to sell the crop of olives then growing upon the trees to the defendant. A written contract was signed by the parties at the time which expressed in brief form the agreement of Kenney to sell and Grogan to buy the olives, it being stated therein that the purchase was made "at the same prices, conditions, and terms as the Olive Growers' Association of Santa Barbara." The prices, conditions and terms, as expressed in the Olive Growers' Association contract referred to, were as follows: "Prices f. o. b. nearest shipping point: $50 per ton for all oil olives (picholenes excepted) when shipped in less than carload lots, and $52 per ton when shipped in sufficient quantities to secure carload rates, $100 per ton for all pickling olives that will run 11/16 in. diameter and larger. Pickling olives to be picked when black and red, and oil olives to be picked when ripe enough to yield an average amount of oil. Payments: ½ of the purchase price of olives will be paid on demand as fast as they are delivered, and the remaining ½ will be paid 30 days after the completion of the delivery."

As testified to by the plaintiff, and not denied by the defendant, at the time the contract was entered into all olives

on the trees were then nearly ripe and about full grown. The
first shipment of oil olives was made by the plaintiff to the
defendant on January 10, 1910, consisting of 3,640 pounds;
on January 17th following, 13,500 pounds were shipped, and
thereafter, on February 7th, February 24th and February
25th, additional of the oil olives were forwarded by plaintiff
to defendant, at which last-mentioned date shipments ceased,
the entire crop having been picked and transported. The
total weight of the olives furnished was 37,938 pounds. In
addition to the oil olives, pickle olives valued,, according to
the contract price, at $10.58 were furnished. The contention
of the defendant was, and which the trial court by its judg-
ment sustained, that none of the oil olives furnished by the
plaintiff were merchantable; that defendant had refused to
accept the fruit for that reason. The particular findings of
the court which were responsive to this issue, read as follows:
"That the defendant did not accept said olives, but notified
the plaintiff that he would make them into oil for the plain-
tiff and hold the said oil subject to plaintiff's order. That
the said olives so shipped were badly frosted, were soft and
pulpy, and were not of a merchantable quality and could not
have been returned by defendant to plaintiff except at a total
loss of said olives, as they would not bear reshipping, and
that defendant made the same into oil for the purpose of
diminishing the plaintiff's loss, and that the oil produced
from said olives is of a very inferior quality, and that there
is no regular market price for olive oil of such poor quality."

There are but two questions, as we view the case, presented
for consideration: First, whether there was implied from the
conditions of the contract made between plaintiff and defend-
ant any warranty that the olives when delivered to the de-
fendant should be of merchantable quality; and, second,
whether, assuming that such a condition is to be implied, the
evidence was sufficient to warrant the court in determining
that the olives furnished were not of merchantable quality.
It may be assumed in considering these questions that the
evidence is sufficient to show that the defendant protected
himself by sufficient notice to the plaintiff of his determina-
tion not to accept the olives proffered in fulfillment of the
contract, and that his acts, as shown by .the testimony, with
reference to his having manufactured the olives into oil, would

not estop him from denying that he had made such an acceptance. It appears quite clear from the testimony that the oil olives when delivered to defendant had been affected by frost. As to the time when they became so affected, whether before or after the making of the contract of purchase by defendant, cannot be told from any of the testimony as it is set out in the bill of exceptions. The defendant, by his own testimony, qualified himself as a man of much experience in the handling of olives and the manufacturing of that fruit into oil and pickles. It is a fair inference from the testimony, while it is not expressly so shown, to conclude that the defendant examined the crop of olives before he made the contract of purchase, for it does not appear that he had not the opportunity of so doing, and it does appear that at the time the contract was made the crop was in an almost mature state. In the language of plaintiff, "the olives were nearly ripe and about full grown." Assuming, however, that the damage done to the crop by frost occurred after the making of the contract and before the fruit was delivered to defendant, the question presents itself as to whether, under the circumstances of the case, the defendant is entitled to claim the benefit of any of the sections of the Civil Code relating to warranty of condition of personal property upon sale thereof. One of the contentions of appellant is that the contract or agreement of sale had the effect of transferring title to the olive crop immediately upon the execution thereof. If such is the case, then, where plaintiff was chargeable with no negligence in the handling of the crop, any loss occasioned by reason of damage thereto by frost would be the loss of the owner, the defendant, and not the vendor. But as we interpret the contract, it was not such a one as contemplated the immediate passing of title to the olives. The crop was then not in a state to be delivered, and not only was it to be left upon the trees until it had become sufficiently mature, but also the vendor was required to pick, pack and deliver it at the shipping point to the carrier. Under conditions of this kind, it is well established that title to merchandise so sold will not pass until delivery is made. (*Walti* v. *Gaba*, 160 Cal. 324, [116 Pac. 963]; *Blackwood* v. *Cutting Packing Co.*, 76 Cal. 212, [9 Am. St. Rep. 199, 18 Pac. 248]; Benjamin on Sales, sec. 318 et seq.; Williston on Sales, sec. 218.) As the title

to the olives did not pass upon the making of the contract, but only upon delivery to the defendant, did the plaintiff, by implied warranty, assure defendant that the fruit when delivered would be of marketable quality? Section 1764 of the Civil Code provides that, "except as prescribed by this article, a mere contract of sale or agreement to sell does not imply a warranty." There are a number of sections of the same code dealing with the same subject, and it seems to be conceded by respondent that, unless some authority is found in those sections justifying his claim of an implied warranty made as to the olive crop, then such a warranty cannot be inferred. Our supreme court in *Browning* v. *McNear,* 145 Cal. 272, [78 Pac. 722], has said: "It is further contended that if there was not an agreement to sell by sample, there was an implied warranty that the goods should be sound and in merchantable condition when delivered upon the barge. The theory appears to be that this is the rule as to all executory sales, as distinguished from the rule applicable to executed sales. In this state the question as to whether there is an implied warranty must depend upon the provisions of our Civil Code." In the case of *Bill* v. *Fuller,* 146 Cal. 50, [79 Pac. 592], the same question was considered, but it was not decided, under the circumstances of that case, that any warranty as to merchantable quality of fruit contracted for should be implied. On behalf of respondent, it is claimed that the provisions of either or both of sections 1768 and 1771, Civil Code, may be invoked for his benefit. Section 1768 reads as follows: "One who agrees to sell merchandise not then in existence, thereby warrants that it shall be sound and merchantable at the place of production contemplated by the parties, and as nearly so, at the place of delivery, as can be secured by reasonable care." Section 1771 provides that, "One who sells or agrees to sell merchandise inaccessible to the examination of the buyer, thereby warrants that it is sound and merchantable." In our opinion, it cannot be said that the merchandise here contracted for was not in existence at the time of the making of the contract, nor that it was inaccessible to the examination of the buyer. The testimony showed, without contradiction, that at the time the contract was made the fruit was on the trees, where it could be observed by the vendee, had he desired to examine it, and that

at no time was it inaccessible to his examination. It was in existence as a crop practically matured when he made his contract to purchase it. It was not a crop to be grown in the future, as was the case in *Blackwood* v. *Cutting Packing Co.*, 76 Cal. 212, [9 Am. St. Rep. 199, 18 Pac. 248]. Even under the common law, unaffected by any of the provisions of our code, under circumstances such as are shown in this case, the rule of *caveat emptor* would apply, and no warranty would be inferred for the benefit of the vendee. (Benjamin on Sales, sec. 644.) We do not mean to be understood by this statement as intending to suggest that an entire destruction of the fruit by the elements would not have relieved the vendee from all of the obligations of his contract. Title not having passed under the contract of sale, it was obligatory upon the vendor to deliver the crop contracted to be furnished, and which was then in existence, to his vendee before he could claim the right to payment therefor. But it does not appear, even by the strongest testimony given upon that subject, that of the defendant himself, that the fruit was so affected as to its quality as to be wholly useless and unsalable. We even think under the testimony that the court was not justified in finding that the olives were of unmerchantable quality. The most that can be said of defendant's claim in this regard is that, while the olives furnished were capable of being manufactured into olive oil, the quality of oil produced was of an inferior grade. We quote his testimony upon this subject: ''The average wholesale price of olive oil made of good olives is about—we get about $1.75 at the present time per gallon. Well, I should consider $1 a gallon would be a good price for this oil, as it stands over there now. The price was the same on or about the twenty-ninth day of April this year. I think I am familiar with olive oil and as to the quality of olive oil. The olive oil that was produced from these olives is a very inferior grade of oil. It couldn't possibly be used for table oil. When I say table oil, it might possibly be used by Italians. They buy a very low grade of oil to use. You couldn't sell it to first-class families for cooking oil even. As to the keeping qualities of oil that is produced from frosted olives, it is good from two and a half to three years. It is a well-known fact that this oil does not keep, and we simply consider it as unmerchantable, or being an inferior grade of oil, and we get

rid of it as soon as we can. It is considered an unsalable oil when it is made. We don't put it in the same class as first-class oil, consequently we get rid of it as soon as we can. It becomes rancid sooner than oil produced from olives not frosted. I can't state how much quicker. . . . I think I could sell it for a dollar a gallon." The testimony showed in general effect that the olives which have been damaged by frost become more or less shrunken, that their keeping quality is interfered with, and, as the defendant stated in his testimony as we have quoted it, the oil produced from such olives would not be termed first-class oil, and would not remain sweet for as great a length of time as oil produced from better fruit. To our mind, this evidence did not show that the olives as furnished by the plaintiff were of unmerchantable quality; the evidence did show that they were not high grade fruit, but rather of an inferior sort. There was nothing in the contract of purchase to show that any special grade or quality was expected to be furnished. That term of the contract which provided that oil olives were to be "picked when ripe enough to yield an average amount of oil," only referred to the state of ripeness at which it was desired that the fruit should be picked, and was not a term fixing the quality of the fruit as being that required to produce any particular amount of oil. Referring to the term "merchantable," Williston on Sales, section 243, states the following: "The requirement, when it exists, that goods shall be merchantable, does not require that the goods shall be of first quality, or even that they shall be as good as the average of goods of the sort. . . . If there is no warranty of fitness for a particular purpose, the buyer cannot claim more than that the goods, with their defects known, shall be salable as goods of the general kind which they were described or supposed to be when bought." Our conclusion is that, under the circumstances of this case, including the conditions surrounding the making of the contract between the parties to this action, there was no implied warranty imposed upon the plaintiff as to the quality which the olives should possess at the time of delivery, and that, further, even conceding that an implied warranty as to merchantable condition became a part of the contract, then the evidence is insufficient to sustain the finding of the court wherein it is determined that the fruit as furnished was un-

merchantable. The evidence did not show that the contract, either in an express way or by the acts of the parties, was modified or changed, or that there was any agreement under which plaintiff became bound to accept the oil manufactured from his olives in lieu of payment according to the terms of his contract.

The order is reversed.

Allen, P. J., and Shaw, J., concurred.