[Civ. No. 1145.   Third Appellate District.—October 21, 1913.]

THOMAS PFOH, Appellant, v. EDWIN G. PORTER et al.,
Respondents.

SALE OF GRAPES—IMPLIED WARRANTY OF QUALITY.—Where grapes are
sold while on the vines, and the seller is informed that the buyer
intends them for table use, a warranty is presumed that the grapes
when delivered will be fit for such use.

ID.—EXECUTORY CONTRACT—GRAPES ON VINE—DAMAGE FROM RAINS.—
Where grapes are sold on the vines before they are ripe, to be picked
and delivered at a railway station and then be paid for at a specified
price per ton, the contract is executory, so that if the grapes are
injured by rain before picking or delivery, the loss does not fall on
the buyer.

ID.—ACTION FOR PRICE—AMENDMENT OF PLEADING.—In an action by the
seller to recover on such contract, the court properly refuses permis-
sion to amend the complaint "according to the evidence" and "set
up a contract of absolute sale."

ID.—MOTION TO REOPEN CASE FOR FURTHER EVIDENCE—WHEN PROPERLY
DENIED.—A motion to reopen the case in order that the plaintiff
may offer additional evidence is properly denied, where not sup-
ported by affidavit or other evidence justifying his omission to offer
the evidence before the submission of the case, and where the evi-
dence, if received, cannot produce a different result.

APPEAL from a judgment of the Superior Court of Butte
County.   John C. Gray, Judge.

The facts are stated in the opinion of the court.

J. R. King, for Appellant.

Geo. F. Jones, for Respondents.

BURNETT, J.—The action was brought to recover the sum
of $496.35, alleged to be due on one original and two assigned
claims for grapes sold to defendants.   The three counts of
the complaint are similar in their allegations as to the terms
of the contracts and as to the injury done to the grapes by
rain, as follows: "That on or about the 20th day of August,
1912, at Gridley, county of Butte, the said defendants entered
into a contract with said plaintiff whereby defendants agreed

to buy and plaintiff agreed to sell all of his Thompson seedless grapes, then on the vines of the property of plaintiff consisting of about 4½ acres . . . amounting to about twenty-five tons, at fifteen dollars per ton, and it was further agreed that plaintiff was to deliver said grapes at the East Gridley Northern Electric Railway station, when said defendants furnished boxes therefor.

"That on or about the 4th day of September, 1912, and while said grapes, so purchased by said defendants were still on the vines, a heavy rain storm occurred, and as a direct result thereof, the said grapes were badly damaged and some of them were wholly destroyed; that after said storm plaintiff delivered about three tons of grapes to said defendants at the station above named in said contract, and said defendants accepted the same, but refused to accept the remainder of the grapes they had so purchased, or any part thereof."

There is no dispute that defendants paid for the grapes that were accepted but the controversy is over those alleged to have been rejected.

Defendants, in their answer, admitted the contract as alleged in the complaint but averred that "by the further terms of said agreement plaintiff specifically agreed that said grapes should be at the time of delivery to said East Gridley Northern Electric Railway station, good merchantable grapes and fit and suitable for table use." Defendants also repeated the allegations as to the storm and alleged "that said rain storm did render the grapes unfit and unsuitable for table use and not merchantable, and consequently they were not in a suitable condition to comply with the terms of the contract of sale."

The court found that the contract was as claimed by defendants, and that as a result of the said rain storm "the grapes which had not been picked were badly damaged, and some of them were wholly destroyed, and they were rendered unfit and unsuitable for table use, and the said grapes were not sound and merchantable at the place of production contemplated by the parties to the contract.".

There can be no doubt that the evidence supports these findings and they, in turn, support the judgment for defendants. As to the quality of the grapes, indeed, the pleadings scarcely leave anything to be supplied since plaintiff with

refreshing candor avers that said grapes were "badly damaged and some of them entirely destroyed." If they were "badly damaged" it could hardly be said that they were sound and merchantable or fit for table use. Defendants, however, did not rest upon the admissions of the complaint but called witnesses whose testimony to the point is sufficient to meet the requirement of the rule.

Mr. Dalton, who was working for plaintiff, testified that he was engaged, after said storm, in hauling the grapes to the railway station and that "they were mouldy" and that he did not "consider them good merchantable grapes." Other disinterested witnesses also testified to the same effect. Defendant, Porter, testified that "some of them were good grapes, as I told them, when they went to pick, I told them not to put anything in but good grapes; and I told Mr. King and Mrs. King, 'You have packed grapes for Gallagher and Harris and you know what they will take and what they won't take,' and I said, 'Don't put anything in there but what you know they will take and it will be all right, I will take them.' " It seems he was buying for Gallagher and Harris to whom he was to ship them in Oakland. Porter went on further to say that no good merchantable grapes were delivered to defendants after said storm at said railroad station and that he paid for all the grapes that were delivered according to the contract.

It may be said also, without quoting further from the testimony, that Porter's explanation of his dealings with plaintiff and the assignors in reference to said grapes, leaves nothing to be desired on the score of justice and equity. We must accept his statements as true and accordingly hold that he acted within his legal rights in declining to accept the damaged grapes, unless, perchance, there was in the contract no warranty, either express or implied, of their quality.

But the court was legally justified in holding that the warranty was one of the express terms of the contract or that it should be inferred from the other terms and conditions. Mr. Porter, indeed, testified that—"They were to be grapes that was fit for table use; that was explicitly understood; . . . The agreement was that I was to give them fifteen dollars per ton for all good grapes delivered at the Northern Electric cars at what is called East Gridley. This contract was made

on the 25th day of August on Sunday. The way that was I had been down to Pfoh's two or three different times to see him about his grapes and made him an offer of twelve dollars and a half a ton and he wouldn't consider it and I told him I couldn't pay any more than that for the grapes unless they were grapes that were fit for table use. . . . I said: 'I will come and look at them, Mr. Pfoh, and if they are fit for table use I think I can give you more.' He knew what I was buying the grapes for and so did all the balance of them. I told them.'' Even the plaintiff would not deny that he warranted the grapes to be merchantable and fit for table use. He was questioned by counsel and he gave answers as follows: ''Do you state positively that you did not·warrant the grapes to be merchantable and fit for table use A. Well— Q. (Int.) Do you or do you not? A. From the way I looked at it is, the way Mr. Porter bought these grapes, he bought them on the looks of them.''

But, regardless of any express agreement to that effect, under the authorities, a warranty is presumed from the nature of the transaction between the parties. In considering this branch of the subject, as well as any other, we must, of course, accept the facts as shown by the evidence favorable to respondents' position.

In principle the case is identical with *Blackwood* v. *Cutting Packing Co.,* 76 Cal. 212, [9 Am. St. Rep. 199, 18 Pac. 248], and *Walti* v. *Gaba,* 160 Cal. 324, [116 Pac. 963]. Here there was no sale but a mere agreement to sell. Indeed, it is so alleged in the complaint. At the time of the contract there was no delivery of the grapes nor payment of the price. The grapes were in fact not in a condition in which the buyer could be called upon to accept them. They were not ripe and therefore not ready for delivery. The amount of the grapes was unknown but was to be ascertained by weighing them at the time they were ready for delivery. In fine, there are present all the substantial elements of an executory contract that are found in the said Blackwood and Walti cases. In the former, it is said: ''It seems well settled that the question as to whether the title was passed is one as to the inten‐tion of the parties. And such intention is, as a matter of course, to be gathered from the language of the parties, considered in the light of all the circumstances of the case.'' It

is further declared that, in the absence of anything showing a contrary intent, there are certain circumstances which have a controlling force. The court proceeds to enumerate those existing in that case. One of them was that, at the time of the contract, there was neither delivery of the goods nor payment of the price. The contract there provided that the fruit was bought "at three cents per pound f. o. b. (free on board cars at) Haywards." It was held that the delivery of the goods and the payment of the price were conditions concurrent. The same is true here. The court declared: "And if the condition of payment is not waived the title does not pass until the price is paid. *Peabody* v. *Maguire*, 79 Me. 572, [12 Atl. 630] ; *Evansville R. R. Co.* v. *Erwin*, 84 Ind. 464; *Turner* v. *Moore*, 58 Vt. 456, [3 Atl. 467] ; *Adams* v. *O'Connor*, 100 Mass. 515, [1 Am. Rep. 137] ; *Hoffman* v. *Culver*, 7 Ill. App. 454."

Other circumstances are said to be more specific *criteria* of the question. Of these one was that the goods were not in a condition in which the buyer could be called upon to accept them as the seller was to give the necessary cultivation to the orchard, pick the fruit, pack it in suitable boxes, and deliver it to the carrier at Haywards. Benjamin on Sales, b. 2, c. 3, is quoted to the effect that "where by the agreement the vendor is to do anything to the goods for the purpose of putting them into that state into which the purchaser is to be bound to accept them, or as it is sometimes worded, into a deliverable state, the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition precedent to the vesting of the property."

There was, it is true, in the Blackwood case another circumstance that probably does not exist here,—namely, some uncertainty as to the identification of the goods. This arose from the fact that the contract of sale was for "not less than seventy-five tons and not exceeding two hundred tons per annum." It was therefore held that segregation and weighing were necessary to identify the goods. The agreement here related to the whole crop. In that respect it differs from the Blackwood case, but the other mentioned circumstances are decisive. It is to be observed also that in the Blackwood case it was held that it was not a sale although the written

contract between the parties recited that the Cutting Packing Company *"bought"* of M. C. Blackwood his crop of apricots" and Blackwood "sold" his crop of apricots to the Cutting Packing Company. In that respect the case was stronger for the asserted vendor than the one here.

The subject was thoroughly discussed in the Walti case, in which the supreme court adopted the opinion of the district court of appeal of the first district, prepared by the late Mr. Justice Hall. From the syllabus we get the following concise statement of the principal facts and of the main point decided by the court: "The plaintiffs, who were the owners of a band of sheep located near Kings City, entered into a written contract which stated that they 'have this day sold' to the defendants 'all of our spring wool clip of 1906 at eighteen cents per pound, also the fall wool clip of 1905 at fourteen cents per pound. The fall wool, which is stored . . . at San Francisco, the spring wool to be delivered at Kings City depot in consideration thereof we accepted a deposit of two hundred and fifty dollars part of payment of said sale, the balance to be paid on the delivery of 'wool.' At the time the contract was executed the spring wool was on the bodies of the sheep. Held, that the contract was not one of present sale, but constituted a mere agreement to sell and buy; that the contract was entire, and did not pass title to any of the wool to the purchasers, and that the latter were under no obligation to pay for any of the wool until the delivery to them of all of it." There is a reaffirmance of the doctrine of the Blackwod case and the court declares that "If the sheep had been destroyed by act of God before the spring wool had been sheared and the wool thus lost, it would hardly be contended by any one that the buyer would bear the loss of the wool, or could be compelled to pay for it. He would not bear such loss because the title to the wool had not vested in him, and by the terms of the contract was not intended to vest in him until it had been sheared and delivered at Kings City."

In what is known as the *Elgee Cotton Case*, 22 Wall. 180, [22 L. Ed. 863], the United States supreme court held that the following contract did not pass the title but must be construed as an executory contract of sale: "We have this 31st day of July, 1863, sold unto Mr. L. our crops of cotton, now

lying in the county aforesaid, numbering about 2100 bales, at the price of ten cents per pound, currency, the said cotton to be delivered at the landing of Fort Adams and to be paid for when weighed, Mr. L. agreeing to furnish at his cost the bagging, rope and twine necessary to bale the cotton unginned, and we do acknowledge to have received, in order to confirm this contract, the sum of thirty dollars. The cotton will be received and shipped by the house of D. & Co., New Orleans, and from this date is at the risk of Mr. L. This cotton is said to have weighed an average of 500 lbs. when baled." After reciting the rules already stated herein that must be applied in ascertaining whether the contract constituted a sale, the court, through Mr. Justice Story, declared: "They are in most cases held to be conclusive tests. Though not supported by all the decisions, they certainly are generally accepted in England, and by most of the courts in this country. In our judgment, therefore, the contract of July 31, 1863, must be regarded as only an agreement to sell and not as effecting a transfer of the ownership. It left the property in Elgee where it was before."

We consider the cases cited by appellant not inconsistent with the foregoing, in view of their peculiar facts. For instance, it is clear that the distinguishing feature of *Bill* v. *Fuller,* 146 Cal. 50, [79 Pac. 592], is the fact that the vendee was responsible for the unmerchantable condition of the fruit. It is so declared in the opinion, as follows: "The fact that they had been allowed to remain so long on the trees and thus become unfit for the market was the fault of the defendant, and he should not be allowed to take advantage of that fault."

After the cause was submitted plaintiff gave notice of motion for leave to file an amended complaint "according to the evidence proved in said cause." It does not appear, except in the opinion of the trial court, what was the specific amendment desired, but it is at least clear from said opinion that the judge considered the proposed amendment irrelevant. He states that the proposition was "to set up a contract of absolute sale" but that "unfortunately for him there was nothing in the testimony that would warrant the court in allowing such an amendment." The trial judge was legally justified

in taking this view of the evidence, and having reached the conclusion from the testimony of the witnesses that there was no sale, of course, it followed that the motion to amend should be denied. At least, in the state of the record, it cannot be said that there was any abuse of discretion therein.

It seems also that a motion was made to reopen the case that plaintiff might offer additional evidence as to certain words that appeared on the checks received in evidence and also that defendant Porter had admitted that he bought said grapes from plaintiff and his assignors. There is nothing to show that this motion was supported by affidavit or other evidence that might justify appellant's omission to present the evidence before the cause was submitted. Besides, it is quite clear that the evidence, if received, would not have produced a different result, the trial judge saying: "The motion to set aside the submission and introduce further testimony in view of what has already been said would be useless and therefore is denied."

Another motion seems to have been made for the court to set aside the judgment for the reason that the judge, in his opinion, had referred to the complaint as verified when, as a matter of fact, it was unverified. But it is apparent that only the trial judge could determine whether that circumstance was a decisive factor in the determination of the cause. In denying the motion he necessarily decided that the mistake was of no consequence. We cannot say that he erred.

We have referred to these assignments of error, although we are not directed to the portion of the transcript containing the record concerning them. We have examined all the points, indeed, made by appellant, but we see no reason for disturbing the judgment of the lower court, and it is therefore, affirmed.

Chipman, P. J., and Hart, J., concurred.