[Civ. No. 3857. Second Appellate District, Division Two.—December 5, 1922.]

KENNETH MacRAE, Respondent, v. J. E. HEATH et al., Appellants.

[1] SALES—TERMS OF CONTRACT—INTENT OF PARTIES—EVIDENCE.— The use of the words "the buyer buys" or "the seller sells," which, standing alone, would import a present passing of title, is not conclusive; and whether there is a sale depends upon the intent of the parties, to be gathered from the language of their contract, read, in case of uncertainty, in the light of the circumstances surrounding its making.

[2] ID.—SUBSEQUENT DELIVERY AND PAYMENT—CONSTRUCTION OF CONTRACT.—Where a contract for the sale of citrus fruit not yet in condition for delivery recites that "the buyer buys and the seller sells the entire crop of citrus fruit," etc., but these words are modified by the words "delivered at a packing-house to be designated by the buyer," and such contract provides that the seller is to care for the fruit until delivery, and that he is to clip the fruit carefully and handle it so as to avoid unnecessary mechanical injury, the buyer within broad limits being given the right to fix the times and quantities of delivery, there being neither immediate delivery nor payment of the purchase price, the terms being, in effect, cash on delivery, and there are no provisions or circumstances surrounding its making that negative the inference from these facts that title was not intended immediately to pass, such contract is not one of sale but is a contract for future delivery and sale.

[3] ID.—KNOWLEDGE OF LAW—PRESUMPTIONS—ILLEGAL CONTRACT.— The parties to a contract for the sale of citrus fruit are conclusively presumed to have known of the act of May 3, 1915, relating to the sale of such fruit, whether or not they had that act in mind when they made the contract, and they must be deemed to have made their agreement in view of its provisions and of its possible effect upon their contract and upon their respective rights thereunder, and they must be deemed to have understood that if, subsequent to their executory agreement to sell, the fruit became frosted to the extent that its sale or shipment would be illegal under that statute, then the vendor could not legally sell nor the vendee legally buy under that contract.

[4] ID.—DELIVERY OF FROZEN FRUIT—INTENT OF CONSUMMATE SALE— PRESUMPTION OF INNOCENCE.—The presumption of innocence which attends people's acts until a guilty intent appears might enable the court to presume in some cases that when delivery is made there is no intent thereby to consummate the sale, but that the delivery is for the purpose of segregating the fruit to enable the parties to know what may lawfully be accepted and paid for under the contract; but that presumption cannot be indulged where the seller delivered expecting payment for all fruit, frozen and unfrozen, he having demanded and collected payment in full for the first three deliveries made, and he seeks to recover the contract price for all the balance of the delivered fruit—the frozen as well as the unfrozen.

[5] ID.—KNOWLEDGE OF CONDITION OF FRUIT—RECOVERY PRECLUDED.— The seller, as well as the buyer, having known at the time of delivery that the fruit was in a condition that rendered its sale unlawful, the seller cannot have the aid of the court to enforce his contract. The illegality of the sale consummated by his own act—delivery of the fruit—precludes a recovery by him of the contract price.

[6] ID.—PROHIBITED CONTRACT—ENFORCEMENT BY COURT.—When a contract is expressly prohibited by law, no court of justice will entertain an action upon it, or upon any asserted rights growing out of it.

[7] ID. — ACCEPTANCE OF FROZEN FRUIT — LIABILITY FOR CONTRACT PRICE—ESTOPPEL.—The contract for the sale of the oranges having been prohibited by law, and therefore illegal, the fact that the frozen oranges were delivered to and received by the buyer did not entitle the seller to recover the contract price; and the sale could not be rendered valid so as to support an action by invoking the doctrine of estoppel.

[8] ID.—DELAY IN DELIVERY—NEGLIGENCE—RESPONSIBILITY FOR.—The contract within certain broad limits having given the buyer the

right to fix the times and quantities of delivery, and the fruit having been delivered within the time thus fixed, the trial court was not justified in finding that the buyer was guilty of negligence for not sooner demanding that the seller pick and deliver the fruit, as a result of which a large part of the fruit was frozen, particularly where the negligence, if any, was completely concurred in by the seller and he, himself, was responsible for much of the delay in picking and delivering the fruit.

[9] ID.—REPUDIATION—TENDER—RECOVERY OF PROFITS.—The buyer not having repudiated the entire contract, which covered the sale of both oranges and grapefruit, but merely having refused to pay for the frozen oranges delivered by the seller, and the seller not having tendered the grapefruit to the buyer before selling it to third parties, the seller was not warranted in treating the entire contract as abandoned and suing for loss of profits on the grapefruit.

APPEAL from a judgment of the Superior Court of Los Angeles County. Lewis R. Works, Judge. Reversed.

The facts are stated in the opinion of the court.

G. P. Adams and W. W. Orme for Appellants.

L. M. Chapman and Ward Chapman for Respondent.

WOOD, J., *pro tem.*—On October 7, 1918, plaintiff as "seller" and defendant Heath as "buyer" executed the following contract:

"For and in consideration of an advance payment of two thousand dollars ($2,000.00), receipt of which is hereby acknowledged, the buyer buys and the seller sells the entire crop of citrus fruit, except lemons, on his several properties at Rialto, San Bernardino County, California, for three cents (3c) per pound for all varieties, delivered at a packing-house to be designated by the buyer, at Rialto, California, at such times and in such quantities as buyer may direct.

"It is understood that the advance will be deducted from the last deliveries made, and that in the event such deliveries do not amount to two thousand dollars ($2,000.00), any balance due will be paid by seller on demand.

"It is also agreed that buyer will pay for each sixty thousand (60,000) pounds of fruit as soon as delivered.

"Seller agrees to take proper care of the orchards, to see that all fruit is carefully clipped, and handled in every respect with a view to avoiding unnecessary mechanical injury.

"Buyer agrees to call for the delivery of all Washington Navels by May 20th, all Med. Sweets and Mikes by June 15th, all Valencias by August 15th, and all grapefruit by October 1st.''

Defendant Angeles Brokerage Company guaranteed the faithful performance of the contract by Heath. Defendant Pann is president and holder of ninety per cent of the stock of the Brokerage Company. Defendants acted together in making the contract and in all that transpired thereafter and will be spoken of herein without distinction as defendants or buyers.

About January 1, 1919, cold weather set in and a large part of the fruit in plaintiff's orchard was frozen. Plaintiff had taken proper care of the orchards and the injury from frost was not contributed to by any negligence of his. In early March defendants directed plaintiff to pick and to deliver the fruit at a packing-house agreed upon, the proprietor thereof becoming under the contract the agent of defendants for the purpose of receiving deliveries. All the oranges, except those in one orchard, the delivery of which was waived by defendants, were duly delivered. When delivered, forty-two per cent of the navels, eighteen per cent of the Mikes, thirty-three per cent of the Valencias, and sixty-two per cent of the Mediterranean sweets were so frozen as to be utterly worthless. There was no delay in delivery not acquiesced in by defendants. There is no complaint of lack of care in picking or handling. Three deliveries, made between March 27th and May 20th, aggregating 198,270 pounds, frozen and unfrozen, were paid for at the contract rate. Defendants refused to pay for the rest of the oranges. Plaintiff sold the grapefruit to third parties at its market price. This, in substance, the trial court finds, and the finding is supported by evidence. The court made other findings to which reference will be made. Judgment was rendered at the contract rate for the oranges delivered and not paid for, and for the difference between the contract price of the grapefruit and the amount for which plaintiff sold them. It was rendered against Heath and the Broker-

age Company for the whole amount, and against Pann for ninety per cent thereof. Defendants appeal.

(a) The first question that confronts us is, Was the contract a sale, sometimes though tautologically spoken of as a "present sale," or was it an executory contract—a contract to sell? If the former, the property in the fruit passed immediately, and the loss by freeze was upon the buyer, regardless of other considerations. If the latter, other serious questions must be examined.

[1] Whether there is a sale depends upon the intent of the parties. . This must be gathered from the language of their contract, read, in case of uncertainty, in the light of the circumstances surrounding its making. The use of the words "the buyer buys" or "the seller sells," which, standing alone, would import a present passing of title (Civ. Code, secs. 1721, 1722; *Johnson* v. *Dixon Farms Co.*, 29 Cal. App. 54 [155 Pac. 134, 136]), is not conclusive. The whole instrument must be examined.

[2] When this contract was made most, if not all, of the fruit was not in condition in which the buyer could be called upon to accept it. The seller was to care for it until delivery. He was to clip the fruit carefully and handle it so as to avoid unnecessary mechanical injury. He might or might not do this. The buyer within broad limits was to fix the times and quantities of delivery. There was neither immediate delivery nor payment of the purchase price. The terms were, in effect, cash on delivery. There are no provisions of the contract or circumstances surrounding its making that negative the inference from these facts that title was not intended immediately to pass. Significantly, the contract words "the buyer buys and the seller sells the entire crop of citrus fruit" are modified by the words *"delivered* at a packing-house to be designated by the buyer." Under the rule in this state, clearly announced by our supreme court, following the supreme court of the United States, and in the main the English rule, and applied by this court, it is clear that this contract is not one of sale but is a contract for future delivery and sale. (*Blackwood* v. *Cutting Packing Co.*, 76 Cal. 212 [9 Am. St. Rep. 199, 18 Pac. 248]; *Walti* v. *Gaba*, 160 Cal. 325 [116 Pac. 963]; *Algee Cotton Cases*, 22 Wall. 180 [22 L. Ed. 863, see, also, Rose's U. S. Notes]; Benjamin on Sales, 7th ed., sec. 318

et seq.; *Kenney* v. *Grogan,* 17 Cal. App. 527 [120 Pac. 433] ; *Pfoh* v. *Porter,* 23 Cal. App. 59 [137 Pac. 44].)

The case of *Bill* v. *Fuller,* 146 Cal. 50 [79 Pac. 592], cannot be regarded as throwing doubt upon the rule. The statement that the agreement there involved imported a present sale is little more than an observation made after the decision of the case upon another point and without consideration of *Blackwood* v. *Cutting Packing Co.* or the rules there set forth. Nor does *Lassing* v. *James,* 107 Cal. 348, 357 [40 Pac. 534] militate against our view that this was an agreement to sell. There the hay sold was in stacks in the field where the buyer under his contract was to pasture his cattle and feed the hay. In effect it was delivered. Nothing further was to be done except to determine the tonnage in an agreed manner and pay for the hay at the agreed rate. The case points out, following *Blackwood* v. *Cutting Packing Co.,* that weighing or measuring to ascertain the price is not an essential to a valid sale where the parties ''agree upon a present transfer, and the thing itself is identified, whether it is separated from other things or not.'' In *Greenbaum* v. *Martinez,* 86 Cal. 459, 464 [25 Pac. 12], a definite number of sacks of wheat were sold at a stated price per cental. The wheat was delivered at an agreed warehouse. Nothing remained for the seller to do except to deliver weight certificates and collect the purchase price. *Miller* v. *Hunt et al.,* 47 Cal. App. 768 [191 Pac. 75], upon the point here under consideration, goes no further than to quote the observation as to passing of title made in *Bill* v. *Fuller,* without adding anything in reasoning or authority that would strengthen the quotation. In *Ginaelli* v. *Globe Milling Co.,* 48 Cal. App. 103 [191 Pac. 720], the hay in question was stacked. Three-fourths of the purchase price was paid. There was nothing further to be done except for the seller, for a consideration apart from the purchase price, to haul the hay to one of two designated places and collect the balance due him. There were special circumstances about the transaction held to indicate an agreement for a present transfer, and the court points out that in such case actual payment or delivery is not necessary to a sale and passage of title. Nothing militating against the rule is found in *Grange Co.* v. *Farmers' Union etc. Co.,* 3 Cal. App. 519 [86 Pac. 615],

and little of value upon the subject is to be found in *Hamilton* v. *Klinke*, 42 Cal. App. 426 [183 Pac. 675].

The fact that plaintiff was notified by defendants to pick and that there was a delivery and acceptance of some of the fruit after the freeze cannot be regarded as a practical construction of the contract by the parties as immediately passing title. Their conduct is to be equally accounted for by the belief that the contract, though executory, still obliged the plaintiff to deliver and the defendants to receive and pay for the entire crop, though injured by the elements. Except for the act of May 3, 1915, which we shall next consider, this belief would have been well founded, for the contract contains no express warranty of the quality or merchantability of the fruit and none is implied by law. (Civ. Code, sec. 1764; *Kenney* v. *Grogan*, 17 Cal. App. 527 [120 Pac. 433]; *Carpenter* v. *Grogan*, 18 Cal. App. 505 [123 Pac. 538].)

(b) Since the contract did not effect an immediate sale, but was only an executory agreement to sell, what is the effect of the act of May 3, 1915, upon the parties' transactions and their remedies? This act provides:

"Section 1. *It is unlawful* for any person, firm or corporation *to ship, offer for shipment, sell or offer for sale* citrus fruits in boxes or in bulk, if the contents of any package, or if the fruit in bulk contains fifteen per cent or more of citrus fruits which on a transverse section through the center, shows a marked drying in twenty per cent or more of the exposed pulp.

"Sec. 2. It shall be the duty of the commissioner of horticulture and his deputies to enforce the provisions of this act and bring to the notice of the proper authorities any violation thereof. The commissioner and his deputies shall have full power to enter any place where oranges, lemons, or grapefruit are *grown, picked, packed, shipped or offered for shipment, sold or offered for sale,* to inspect such place or any part thereof.

"Sec. 3. Any person, firm or corporation violating any provision of this act is guilty of a misdemeanor."

Section 11a of the act of May 24, 1917 (Stats. 1917, p. 909), prohibiting the sale of citrus fruits which are "frozen to the extent of injuring the reputation of the citrus industry of the state of California, if shipped," and which

is unconstitutional for the same reason that made invalid the act of June 3, 1921 (Stats. 1921, p. 1234; *In re Peppers,* 189 Cal. 682 [209 Pac. 896]), only purported to supplement and did not repeal, expressly or impliedly, the act of May 3, 1915. The same is to be said of section 9 of the act of May 27, 1919 (Stats. 1919, p. 1221). Incidentally, it may be noted that the act of 1917 expressly excepted from its operation the sale of frozen fruit to by-product factories and the sale of citrus fruit on trees, an exception that the legislature did not see fit to make from the more definite prohibitions of the act of 1915.

The act of May 3, 1915, applies to the fruit covered by this contract. There is no room for construction to exclude sale of fruit on trees. The legislative intent is clear. The expediency of including in the act the sale of such fruit, particularly when the contract for sale is made when the fruit is perfectly sound, may be open to question. The power of the legislature to so include it is not.

[3] It does not appear whether when plaintiff and defendants made their agreement they had the act in mind. They are, however, conclusively presumed to have known of it. They must be deemed to have made their agreement in view of its provisions and of its possible effect upon their contract and upon their respective rights thereunder. They must be deemed to have understood that if, subsequent to their executory agreement to sell, the fruit became frosted to the extent that its sale or shipment would be illegal under the statute, then the vendor could not legally sell nor the vendee legally buy under that contract. Under their agreement only delivery can effect a transfer of the title and consummate the sale. Then, but then only, is there a "sale." Though the executory agreement be valid when made, if the fruit later becomes frosted to the extent proscribed by the act, a "sale" thereof is illegal; and, therefore, delivery for the purpose of effecting a sale under the contract is equally illegal. There were several deliveries, each made by plaintiff for this purpose. Each was an illegal act.

[4] The presumption of innocence which attends people's acts until a guilty intent appears might enable the court to presume in some cases that when delivery is made there is no intent thereby to consummate the sale, but that the de-

livery is for the purpose of segregating the fruit to enable the parties to know what may lawfully be accepted and paid for under the contract. Here, however, the presumption cannot be indulged. The seller delivered expecting payment for all fruit, frozen and unfrozen; he demanded and collected for the first three deliveries; and he seeks here to recover the contract price for all of the balance of the delivered fruit—the frozen as well as the unfrozen.

[5] The rule sometimes applied that ignorance, not of the law but of the fact which makes the act illegal, saves the act from its ordinary consequences cannot be invoked in plaintiff's behalf. Whatever might be said as to when the parties first definitely knew that the fruit was in a condition that rendered its sale unlawful, there can be no question that both parties knew it when the first fruit passed through the separator. The fruit, for the full contract price of which plaintiff had judgment, was all delivered later, when its condition was substantially known to all. Under such circumstances plaintiff cannot have the aid of the court to enforce his contract. The illegality of the sale consummated by his own act, delivery of the fruit, precludes a recovery by him of the contract price. The sale is void, not because it is contrary to public morals or founded on an immoral consideration, but because the statute expressly declares it so.

[6] The law applicable is fully stated in *Berka* v. *Woodward*, 125 Cal. 119–126 [73 Am. St. Rep. 31, 45 L. R. A. 420, 57 Pac. 777], a decision cited, followed, and not questioned in later decisions of our supreme court, and relied upon by the courts of last resort of many other states. "This, then, is the undoubted rule; that when a contract is expressly prohibited by law, no court of justice will entertain an action upon it, or upon any asserted rights growing out of it. And the reason is apparent, for to permit this would be for the law to aid in its own undoing. Says the supreme court of the United States in *Bank of United States* v. *Owens*, 2 Pet. 527 [7 L. Ed. 508]: 'No court of justice can in its nature be made the handmaid of iniquity. Courts are instituted to carry into effect the laws of the country. How can they become auxiliary to the consummation of violations of law? There can be no civil right where there can be no legal remedy, and there can be no legal remedy for that

which is itself illegal.' And again the same august tribunal, in *Coppel* v. *Hall*, 7 Wall. 542 [19 L. Ed. 244], says: 'Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract and void for the same reasons. Where the contamination reaches it destroys. The principle to be extracted from all the cases is that the law will not lend its support to a claim founded on its own violation.' "

[7] The fact that the frozen oranges were delivered to and received by the buyer does not entitle the seller to recover the contract price. The sale being illegal, and therefore void, it cannot be rendered valid so as to support an action by invoking the doctrine of estoppel. This is likewise completely covered by the court in *Berka* v. *Woodward, supra:* "Nor in such case does it matter whether the contract has been partially or wholly performed, or whether the consideration has passed or not. 'The test,' says Judge Duncan in *Swan* v. *Scott,* 11 Serg. & R. 164, 'whether a demand connected with an illegal transaction is capable of being enforced at law, is whether the plaintiff requires the aid of the illegal transaction to establish his case. If the plaintiff cannot open his case without showing that he has broken the law, the court will not assist him, whatever his claim in justice may be upon the defendant.' And this must be so, for, while as a matter of private justice between individuals it would be but fair that one under such an illegal contract should restore the consideration or should make the payment, the rights of the public are superior to any such private considerations, and the public's right is that the fountains of justice shall remain unpolluted; that no court shall lend its aid to a man who grounds his action upon an immoral or illegal act. Therefore, there is no place for equitable considerations, presumptions, or estoppels. (*Fowler* v. *Scully,* 72 Pa. St. 456 [13 Am. Rep. 699].) *Ex turpi causa non oritur actio.* Whenever such a contract comes before the court the action must fail, and the parties will be left in the situation in which they may be found. Some slight attempt will be found occasionally to evade the application of this well-settled doctrine upon the ground of the hardship which

sometimes results, but in no case, we think, has the existence of the rule been denied, or its justice as a matter of commanding public necessity been questioned.''

In *Kreamer* v. *Earl*, 91 Cal. 112 [27 Pac. 735], it is held that, although the point be not raised by either party, when the illegality of the contract appears, it is the duty of the court to refuse to enforce it. In *Colby* v. *Title Ins. & Trust Co.*, 160 Cal. 633 [Ann. Cas. 1913A, 515, 35 L. R. A. (N. S.) 813, 117 Pac. 918], the court, citing many decisions in support thereof, says: ''But the doctrine of estoppel by conduct or by laches, or even ratification, has no application to a contract or instrument which is void because it violates an express mandate of the law or the dictates of public policy.'' As aptly stated in 23 Ruling Case Law, page 1321: ''The objection that a contract is immoral or illegal as between the plaintiff and defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff; not for the sake of the defendant, but because the court will not lend its aid to such a plaintiff. So, if the plaintiff and defendant were to change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, *potior est conditio defendentis.*''

Counsel for plaintiff say that under the contract plaintiff was bound to deliver the entire crop regardless of its condition, citing *Rosenberg* v. *Rogers*, 44 Cal. App. 196 [186 Pac. 366]. That case is inapplicable. No question of illegality was there involved. If the defendants had demanded the whole bulk of the oranges as a delivery under, and a consummation of, the contract of sale, plaintiff would have been protected by the statute in refusing to so deliver them. That he could have lawfully delivered them, if required by defendants, not in expectation of receiving the contract price for the whole, but to enable the separation of the frozen from the unfrozen fruit, and payment for that the sale of which is not prohibited, there can be no doubt. Whether he himself could have separated the unfrozen fruit and then have required defendants to accept and pay for the unfrozen part of the entire crop contracted for, is a matter of in-

teresting speculation, but unnecessary to decide.  However this may be, hard cases do not enable us to fly in the face of established law.

[8]   (c) The trial court found: "All of the Washington navels, which comprise about one-third of all the oranges, were matured and ready for shipment at least as early as January of 1919, and might have been shipped in that month, and if they had been called for by defendants and packed during that month, the loss from damage by frost would have been insignificant; but defendants neglected to call for delivery of said fruit until the month of March, when the damage resulting from the frost had very much increased.   Likewise the greater part of the remaining fruit was matured and ready for shipment at least as early as April, but defendants neglected to call for the delivery of the same until after the first of May, at which time the damage had materially increased, and the loss was much greater on account thereof than it would have been if delivered, packed and shipped earlier."   Relying upon this finding and upon the authority of *Bill* v. *Fuller,* 146 Cal. 50 [179 Pac. 592] and *Miller* v. *Hatch & Co.,* 47 Cal. App. 768 [191 Pac. 75], plaintiff urges that defendants "must stand the loss that resulted" from failure to take the fruit earlier. The findings, however, do not show what that loss is, nor does the proof.   Clearly the delay found did not occasion the whole loss and thereby justify the judgment for the total contract price of the fruit.   Nor is there any finding that plaintiff demanded that defendants take the fruit earlier than they did.   The proof shows beyond cavil that plaintiff at least acquiesced in the fruit being taken when it was, made no protest or demand that it be taken sooner, and himself, though directed by defendants in early March to pick the navels and follow with the other oranges, took until March 29th to finish picking the navels, and then allowed forty-four days to elapse after the navels were picked before beginning to pick the other oranges.   It is true defendants made no serious protest at this delay, and the trial court finds that plaintiff complied with defendants' directions as to delivery; but that does not affect this question.   Herein is the marked distinction between this case and *Bill* v. *Fuller* and *Miller* v. *Hatch et al.,* in each of which cases the seller insisted that the fruit be taken and the buyer refused to take

it. Under the contract, defendants had until long after the times mentioned in this finding to take the fruit. It is difficult to see how they could be charged with the loss on the ground of negligence for not sooner demanding that plaintiff pick and deliver the fruit, when the negligence, if any, is so completely concurred in by plaintiff himself.

It must further be pointed out that the evidence shows beyond question that no one knew certainly to what extent the fruit was frozen until it had passed through the separator, and could not even closely estimate the damage until many weeks after the freeze, when through evaporation of juice from the frost-broken cells the drying disclosed the damage. The horticultural commission on January 5th placed, and until January 25th maintained, a strict embargo on shipments, indeed successfully prohibited shipment of one car of plaintiff's oranges from another point, though no discoverable drying of the fruit had occurred. By plaintiff's own testimony it appears that defendants believed, though mistakenly, that the fruit would fill out again with watering, and that plaintiff agreed to water it. For these reasons it was difficult for either party to know what best to do. In face of these facts, the finding of negligent delay on the part of defendants cannot be supported.

(d) Under the contract defendants had until October 1st to call for delivery of the grapefruit. On August 20th plaintiff sold this fruit to another. The trial court rendered judgment for the difference between the amount received by plaintiff and the contract price. This judgment is proper only under the finding that about June 27th defendants "repudiated said contract and refused to accept any further deliveries of any fruit thereunder," and that plaintiff was "ready, able and willing to deliver" the grapefruit in accordance with the contract and offered to do so, but that defendants "refused to accept or receive the same."

[9] For the finding that plaintiff offered to deliver the grapefruit and that defendants refused to accept or receive it there is no evidence whatever. The finding of repudiation can be upheld only if the failure of defendants to pay for all of the delivered oranges may be deemed to be a repudiation. Under the facts in evidence it clearly cannot. Defendants never evinced an intention to abandon the contract. After the oranges were all delivered and part of them paid

for, a controversy arose as to whether under the contract defendants were called upon to pay for the frozen and discarded fruit. There were friendly conversations and letters between the parties looking to a settlement. Heath, Pann, and another witness testified positively and clearly to facts which, if true, would show an accord and satisfaction, whereby defendants paid $1,500 for the oranges in one orchard and plaintiff was permitted to keep those oranges, and was to keep the grapefruit, the payments made for the first deliveries of oranges, frozen and unfrozen, to be received in full consideration for all deliveries of oranges. Plaintiff, though his testimony is not clear, finally denied this settlement, and the court found with him, thereby ending the matter. However, he did keep the grapefruit. According to plaintiff's own testimony—and there is no other upon this subject except that last mentioned—the last conversation respecting settlement was on August 7th, and it ended as follows: "I said 'Pann, what is your idea of this?' and he said, 'My opinion is that Mr. Heath don't owe you anything.' I got up and said, 'Good day, gentlemen,' and walked down street." After that, as he says, "I met them occasionally, but never talked to them about any of these matters, and never made any demand on them to pay me before suit was filed." His other testimony on the subject is: "Q. Did you ever offer to any of them to pick and make delivery of the grapefruit? A. Oh, repeatedly. The first offer was to Mr. Heath. They were both at Rialto, and frequently were in May, and I said, 'This stuff is dropping bad; it should be picked off.' Heath said they would take every pound of it and pay for every pound. . . . We were not talking about the grapefruit particularly then—it was about the oranges, the whole thing. . . . They did not say they would not take the grapefruit, but I never delivered it to them because I didn't get paid for what I did deliver." Speaking of the effort at compromise, he said: "I finally told them—they said that they did not want to take the grapefruit; they were figuring about paying for all the fruit they shipped, and if they would pay for that I was to keep the grapefruit, but they didn't pay for it. In Mr. Pann's office we were trying to compromise, but they did not tell me they would not take the grapefruit." Later in his testimony: "Q. Well, then, you never did agree to take the

grapefruit? A. No, because it was only part of a tentative agreement that was never carried out, never concluded, never closed.''

These facts do not, nor do any facts in evidence, show a repudiation of the entire contract or any refusal by defendants to take the grapefruit. According to the testimony of plaintiff himself, the reason why he did not deliver the grapefruit was ''because I didn't get paid for what I did deliver''—referring to the delivered oranges. Plaintiff made no tender of the grapefruit before selling it, and the buyer's mere failure to pay for the oranges did not warrant plaintiff in treating the entire contract as abandoned and suing for loss of profits. (*Palm* v. *Ohio etc. R. R. Co.*, 18 Ill. 217.)

There is nothing against this view in *Jensen* v. *Goss*, 39 Cal. App. 427 [179 Pac. 225], and *Minaker* v. *California Canneries Co.*, 138 Cal. 239, cited by plaintiff. In each of these cases the purchaser showed a clear intention to violate the contract, and in each case it was held that *rescission* was thereby justified. The holding of *San Francisco Bridge Co.* v. *Dumbarton L. & I. Co.*, 119 Cal. 272 [51 Pac. 335], is that the failure to make agreed monthly payments called for by a contract is a substantial breach thereof, justifies the other party in refusing to proceed thereunder and enables him to maintain an action in *quantum meruit* for the value of work and labor done. The relief sought by plaintiff here is different from that granted in any of these cases. Here the plaintiff has not rescinded, but, seeking to keep the contract alive in part for the purpose of recovering part of the purchase price, he sues for the profits which he would have realized under another part of the contract had the contract been performed. The latter he may do only if he has been ''prevented'' from himself performing—the third of the species of relief for breach of contract pointed out in *McConnell* v. *Corona City Water Co.*, 149 Cal. 65 [8 L. R. A. (N. S.) 1171, 85 Pac. 929]. In the case of *Cox* v. *McLaughlin*, 52 Cal. 596, and 54 Cal. 605, it was held that the mere failure to pay an installment due under a contract, while justifying rescission and recovery of the value of the work actually done, does not entitle one to this third species of relief—does not authorize the abandonment of the contract and its performance and at the same time an action to recover the

benefits that would have been received had there been performance, which is what the plaintiff here is seeking to do.

Another consideration leads to the same end. As already seen, the delivery of the oranges frozen beyond the degree proscribed by the act of May 3, 1915, was illegal. Defendants were not obliged to pay the contract price therefor. A refusal to do that, the doing of which the law forbade, could scarcely be deemed a repudiation of a legal obligation.

Other points are raised and have been considered, but we deem those passed upon determinative of the appeal.

The judgment is reversed.

Finlayson, P. J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 4, 1923, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 1, 1923.

All the Justices concurred.