405 P.2d 963

Phillip S. MARTIN and Southern Idaho Production Credit Association of Twin Falls, Idaho, a corporation, Plaintiffs-Respondents,

v.

W. B. WHITELEY, Defendant-Appellant.

W. B. WHITELEY, Third-Party Plaintiff and Counter-Defendant-Respondent,

v.

EASTERN IDAHO PACKING CORPORATION, a corporation, Third-Party Defendant and Counter-Claimant-Appellant.

Nos. 9491, 9492.

Supreme Court of Idaho.

Sept. 23, 1965.

Parsons, Smith & Snow, Burley, for Eastern Idaho Packing Corp.

Herman E. Bedke, Burley, for Whiteley.

William J. Langley, Twin Falls, for plaintiffs-respondents.

McFADDEN, Justice.

This cause involves two separate appeals consolidated by stipulation for briefing and argument. The respective parties, sometimes will be referred to as follows: the plaintiffs-respondents, in No. 9492, Martin and Southern Idaho Production Credit Association of Twin Falls, Idaho, as Martin, inasmuch as the interest of the Credit Association is that of a mortgagee; W. B. Whiteley, defendant-appellant, in No. 9492, and the third-party plaintiff, counter-defendant and counter-claimant, as Eastern.

During 1962, Martin raised a crop of potatoes which he stored in a potato cellar located on his property. In late October, 1962, Whiteley, who was engaged in the farming and produce business discussed with Martin the purchase of the potatoes. The initial discussions were to the effect that Martin wished to sell the stored, ungraded potatoes, which he estimated to be about 31,000 cwt. (sacks). Whiteley indicated that he would purchase the lot if there were that many and requested the opportunity to examine them.

He then examined the potatoes and upon measuring them estimated the quantity to be over 32,000 cwt. At his direction his bookkeeper prepared a sales agreement, which both Martin and Whiteley executed, reading as follows:

"THIS AGREEMENT Made and entered into in triplicate this *5th* day of *November, 1962*, by and between *W. B. Whiteley* of Oakley, Idaho, hereinafter referred to as the Buyer, and *Phillip S. Martin,* of Burley, Idaho, hereinafter refereed to as the Seller

WITNESSETH:

That for and in consideration of $50,-000, the Buyer agrees to buy and does buy from the Seller, and the Seller agrees to sell and does sell to the Buyer the *31,000* cwt. bin run Idaho Russet potatoes, Said potatoes in storage located on Phillip S. Martin ranch, *9 miles,* South of Burley, Idaho."

The parties agreed that Martin would take a credit memorandum from Whiteley, which would be paid on demand after January 1, 1963, and such a memorandum was delivered to Martin.

Later Whiteley entered into negotiations with Eastern Idaho Packing Corporation for the purchase by it of the Martin potatoes. There was no written memorandum of the terms of this transaction, and the exact terms as agreed are in conflict. Whiteley contends that he sold the crop of potatoes for $50,000, to Eastern and was to re-

ceive $5,000 for running them over an eliminator, loading and hauling them to the Eastern's warehouse. On the other hand Eastern contends it agreed to purchase the potatoes from Whiteley for $55,000 and Whiteley agreed to sort out the seed potatoes, load and haul them to the warehouse. The parties agreed that Whiteley would purchase the seed potatoes back from Eastern at $1.50 per sack, less the cost of sorting and sacking them.

Before Whiteley and Eastern reached any agreement, a representative of Eastern and a representative of the National Produce Distributors, a company associated with Eastern, inspected and measured the stored potatoes.

The only written evidence of the agreement between Whiteley and Eastern is to be found in two letters: the first written by Mr. Reitman, a representative of Eastern to National Produce Distributors, Inc., under date of December 14, 1962 stated:

"Please be advised that EIPC [Eastern] now owns the potatoes that you looked at with Whiteley and myself on our last visit here. The deal is as follows:

The trade was made with the following understanding: This cellar of potatoes contains approximately 32,500 bags of field run for which we pay Whiteley $55,000 from this cellar of potatoes. For this price he is to run these pota-

toes over an eliminator setting back the seed, load the commercials, haul and deliver same to EIPC warehouse. The seed which remains in the cellar Whiteley as agreed to buy at $1.50 cwt. in the cellar. * * *"

The second letter, written about ten days later by the representative of National Produce Distributors, Inc., to Whiteley, confirmed the statement of the agreement contained in the first letter. Whiteley testified that he notified Eastern's representative, Mr. Reitman, that the agreement as set forth in the letters did not provide for the subtraction of the sorting and sack costs from the $1.50 per sack for seed potatoes.

Whiteley paid Martin $28,000 on the purchase price of the potatoes. Eastern paid Whiteley $27,500.00. Eastern also gave Whiteley a check for $22,500, and Whiteley issued a check to Martin for $22,000. In March, 1963, Eastern requested Whiteley to haul the potatoes from the cellar to the warehouse, but at that time Whiteley, not having the trucks or equipment, agreed to use some of Eastern's trucks and equipment. When the trucks were being loaded, Eastern's representative observed frost damage to the potatoes, and Eastern stopped payment of its check to Whiteley, who in turn stopped payment of his check to Martin. Eastern complained of the frost damage to Whiteley, who in

turn contacted Martin and discussions were had relative to the frost damage. No settlement having been reached, Martin instituted this action against Whiteley for the balance due him of $22,000.00. In turn, Whiteley brought Eastern into the case by a third party complaint for the balance he claimed due and owing.

Eastern filed a counterclaim against Whiteley claiming an offset by reason of the frost damage to the potatoes, to be offset against the amount Whiteley claimed against Eastern, and asked for judgment for the balance.

The cause was tried before the court on issues framed on the various pleadings, and the trial court entered findings of fact, conclusions of law and judgment on Martin's claim against Whiteley; also entered separate findings of fact, conclusions of law and judgment on the third party claim of Whiteley against Eastern and the counterclaim interposed by Eastern, and judgment in favor of Martin against Whiteley for $22,000; also entered another judgment in favor of Whiteley against Eastern for $23,500, (being balance of $27,500, less $4,000 offset which Whiteley agreed he owed Eastern).

Whiteley first appealed from the judgment entered against him; Eastern then separately appealed from the judgment entered against it, which appeals were consolidated for briefing and argument.

Whiteley challenges certain of the court's findings of fact and conclusions of law and contends error in the court's conclusion that title to the potatoes sold Whiteley by Martin passed to Whiteley on November 5, 1963, the date of the written agreement. It was Whiteley's contention throughout the case and on this appeal, that Martin was under the duty to care for the potatoes while stored in the cellar.

Eastern in its appeal from the judgment against it in favor of Whiteley, claims error committed by the trial court in entering certain findings of fact; in failing to find other facts; in certain of its conclusions of law; in the failing to enter converse conclusions, and in entering judgment in favor of Whiteley.

Resolution of the question as to when the title to the potatoes actually passed in the transaction between Martin and Whiteley, and between Whiteley and Eastern was the determinative issue in the lower court. Risk of loss by freezing or otherwise would follow the title. I.C. § 64–206.

Because Whiteley could convey to Eastern only such title as he had, it first becomes necessary to consider the issues presented by the Whiteley appeal.

The trial court found that Martin and Whiteley executed the written agreement whereby Martin in consideration of $50,000 sold the crop of potatoes stored in the cel-

lar owned by a third party and rented to Martin; that the lot or crop consisted of 31,000 cwt. of field-run potatoes; that Martin was not required to deliver the crop to Whiteley, who was to remove them from the cellar himself after November 5, 1962; that Martin did not agree to perform any further acts in connection with the potatoes, including care of the potatoes after November 5, 1962, but that an employee of Martin's performed certain acts during the period of time the potatoes were in the cellar to protect the crop from frost; that the potatoes were in good condition on November 5, 1962, and remained in good condition until February, 1963; that there was no negligence or lack of reasonable care or attention by Martin or any of his employees concerning the potatoes; that it was the intention of the parties that title pass from Martin to Whiteley on November 5, 1962.

The agreement above set out is expressed in the unconditional terms that Martin sold the potatoes to Whiteley, and that Whiteley bought them from Martin; the goods involved were ascertained and identified and were in a deliverable state. The credit memorandum given by Whiteley to Martin was not qualified in any manner. Nothing appears in the record showing any intention of the parties that the title was not to pass. I.C. § 64–203, Rule 1, provides:

"Unless a different intention appears, the following rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer:

Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed."

In O. A. Olin Co. v. Lambach, 35 Idaho 767, 770, 209 P. 277, this court stated:

"The rule adopted by the majority of modern authorities, and supported by reason, is identical with that embodied in the Sales Act, [I.C. Title 64, Ch. 1, to 7 incl.] viz., that the title to an article sold is presumed to pass when the contract is made, if the article is identified, and nothing remains to be done other than the delivery of the goods and the payment of the price."

The record fully substantiates the findings of fact by the trial court, and there was no error by the trial court in its conclusions of law. The judgment of the trial court on the Whiteley appeal is affirmed.

As to Whiteley's third party claim against Eastern, the findings of the trial court were to the effect that Whiteley sold the Martin potatoes to Eastern for $55,000, payable after January 1, 1963, upon demand of Martin from Whiteley; that Whiteley was to run the potatoes over an eliminator [1] and haul them to Eastern's warehouse, and he agreed to buy back the seed potatoes; that Eastern notified Whiteley it desired delivery of the potatoes during the latter part of March, 1963, but Whiteley was unable to do this, so Eastern furnished a portion of the labor and equipment to do it; that Whiteley and Eastern stipulated in open court that Whiteley was indebted to Eastern for these services and for the seed potatoes in the sum of $4,000.00; that Whiteley and Eastern intended title to the potatoes to pass to Eastern on December 14, 1962, as evidenced by the written memorandum of Eastern of the same date; that the agreement of Whiteley to run the potatoes over an eliminator and haul them to Eastern did not constitute putting the potatoes in a deliverable state as contemplated by I.C. § 64–203; that on December 14, 1962, the potato crop was in good marketable condition; that Eastern paid $27,500 on the price and failed to pay the balance of $27,500, which Eastern owes to Whiteley, less the $4,000 set off.

Eastern contends that title did not pass to it on December 14, 1962, but that Whiteley still had services to perform to put these potatoes in a deliverable state. (I.C. § 64–203, Rule 2 and Rule 5.) In support of this contention Eastern points out that Whiteley was obligated to run the potatoes over an eliminator and also to deliver them to Eastern's warehouse.

■ The trial court's view was that the potatoes were already in a deliverable state and that the acts required by Whiteley were not necessary to put them in a deliverable state (I.C. § 64–203 Rule 1). The running of the potatoes over the eliminator in this instance was a part of the loading process, and was only incidental as to the purchase by Eastern, but necessary in order to determine the seed potatoes Whiteley was buying from Eastern. The record is clear that Eastern was purchasing not only the commercial potatoes in the lot, but that it intended to purchase all of the potatoes, regardless of size, and then sell the seed potatoes to Whiteley after they were segregated. The crop of potatoes being purchased was designated and identified in the letter of Eastern on December 14, 1962. The record fully sustains the finding of the trial court in this regard.

1. Testimony described the eliminator as a device used in sorting the smaller potatoes from the larger; that it was adjustable as to the size of potatoes to be taken out and could be set up in the loading process.

Eastern asserts the trial court erred in failing to find that there existed a custom-age and usage in the fresh pack potato prod-uce industry to the effect that where the owner of a lot of potatoes sells them to a fresh pack shipper at its warehouse, it is understood, unless a contrary agreement is reached, that the property in, title to, and risk of loss of damage does not pass from the seller to the buyer until delivery is made. The evidence submitted to this point was conflicting.

Mr. Mayall, a fresh pack potato shipper from Pocatello, Idaho, testified that there was a custom in the industry that if a person sells potatoes under an agreement requiring delivery to the buyer, then title passes upon delivery unless otherwise specified. On cross-examination, however, Mr. Mayall testified that if a buyer inspects the potatoes and agrees to pay a price for the lot as a whole, he assumes risk of cellar shrinkage and frost damage.

Mr. Neibaur, a farmer and fresh pack shipper, in response to a question propounded by the court testified contrary to Mr. Mayall, i. e., that when a buyer inspects the potatoes and agrees to pay a price for the lot as a whole, unless there is a specific agreement to the contrary, the risk of loss would remain on the farmer until delivery.

The trial court committed no error in not finding any custom and usage in this regard, for such a custom and usage must be clearly proven; where the evidence is uncertain and contradictory, the custom is not established. Dingler v. Simpson, 83 Idaho 439, 364 P.2d 181.

I.C. § 64–203, provides:

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer:

* * *

"Rule 5. If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

This provision creates a statutory presumption similar to the trade custom Eastern sought to establish. The presumption is not conclusive and may be rebutted by evidence showing a contrary intention. In Williston, Sales § 279 B, it is stated:

"Other circumstances of the contract, however, may make it evident, in spite of the seller's duty to pay the freight, that the intention of the parties was not to impose any obligation upon the seller to deliver the goods at the point of destination, but merely as

a matter of adjustment of the price to throw the expense of the freight upon the seller. Thus if a contract which provides for the payment of the freight by the seller also provides for payment of the price at a time prior to the arrival of the goods at their destination, it is a fair inference that the transfer of the property was not to the deferred until the arrival of the goods."

See also: Fiddyment v. Johnson, (1912) 18 Cal.App. 339, 123 P. 342.

The trial court's findings that Whiteley and Eastern intended title to pass on December 14, 1962, is based upon the letter set forth previously in this opinion.

I.C. § 64-202 provides:
"Property in specific goods passes when parties so intend.—

1. Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

2. For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case.

I.C. § 64-203 gives five rules for ascertaining the intention of the parties under circumstances mentioned in I.C. § 64-202 supra. Of the five rules set out in I.C. § 64-203, Rule 1 and Rule 5 have been set out above. Rule 2 provides:

"Where there is a contract to sell specific goods and the seller is bound to do something to the goods, for the purpose of putting them into a deliverable state, the property does not pass until such thing be done."·

Mr. Reitman the representative of Eastern testified:
"Well, since my now deceased partner (Mr. Siegel) had questioned me repeatedly whether he did or didn't buy those potatoes, I periodically called Mr. Whiteley and on this particular day when I sent the letter of confirmation to Chicago to my partner, we had then closed the deal on those potatoes with the terms as stipulated in the letter."

As to the terms of the agreement, Mr. Reitman testified:

"I was informed of the nature of purchase and the price for that cellar

of potatoes. Now, Mr. Whiteley offered us those potatoes at $55,000, which is a $5,000 profit to him, with the condition that he would perform the function of careing for, hauling, delivering these potatoes to our warehouse after the eliminators had been removed in the cellar, for which he was to buy from us at $1.50 per hundred weight."

"It is my understanding I was to give Mr. Whiteley $5,000 over and above the purchase price for the performance of the duties as stipulated in the letter."

Mr. Whiteley, however, testified as to the initial negotiations:

"Well, he [Reitman] wanted to know what I would take for them. And I finally told him that I had $50,-000 in them, and I would take $50,000, First I asked him for $55,000, and then I told him that I would perform the services of delivering them to him for that. And then we arrived at $50,000 for the block as is, and we left the option as to who was to deliver them. And then we came up with another agreement that he was to take them for the $50,000 and would give me $5,000 for hauling them to the Eastern Idaho plant."

The circumstances surrounding this transaction, inter alia, the statement of Mr. Reitman that Whiteley was to receive $5,000 over and above the purchase price for the performance of the duties, the understanding of the transaction as testified to by Mr. Whiteley, the use of the following terms in the correspondence: "EIPC now own the potatoes" and "you finally sold us that cellar of potatoes", indicate the intent of the parties that the title to and property in the crop of potatoes passed on December 14, 1962. Eastern, however, argues that the words or phrases in a contract to sell denoting present transfer of title, such as "own" or "sold" are not conclusive as to intent of the parties, citing: 46 Am.Jur. 585–6, Sales § 413; Idaho Products v. Bales, 36 Idaho 800, 214 P. 206; M. P. Miller Milling Co. v. Butterfield-Elder Co., 32 Idaho 265, 181 P. 703; Portland Seed Co. v. Clark, 35 Idaho 44, 204 P. 146; Blackwood v. Cutting Packing Co., 76 Cal. 212, 18 P. 248 (1888); Universal Sales Corp. v. Cal. Press Mfg. Co., 20 Cal.2d 751, 128 P.2d 665 (1942). However, these cited cases involved the sale of goods not in existence at the time of the contract, or goods that were sold on a trial basis. Although the use of the terms "own" or "sold" are not conclusive as to intent, certainly the use of such words under these circumstances is strong evidence of the intent of the parties to exercise immediate domain over the property in question.

On January 16, 1963, Eastern made a $5,000 payment to Whiteley on the potatoes, with a memorandum attached to the check which stated: "Deposit on purchase of Phil Martin lot of potatoes located in Phil Martin Cellar. Terms of purchase per letter dated December 14, 1962." Eastern wrote two additional checks to Whiteley on March 19, 1963, before discovery of the frost damage. These two checks were each in the amount of $22,500, the first deposited and paid, the second not to be deposited until April 20th, payment of which latter check was refused upon presentation. This is further evidence that it was the intent of the parties to transfer title before there was any delivery; otherwise Eastern would not have made payment until delivery.

The record fully substantiates the trial court's findings of fact, and no error appears in the trial court's conclusions to the effect that the parties intended title to the lot of potatoes to pass on December 14, 1962.

In reiteration, the judgment in Martin's favor against Whiteley is affirmed, with costs to Martin. The judgment in favor of Whiteley on his third party complaint and against Eastern, also is affirmed, with costs to Whiteley on the appeal from that judgment.

McQUADE, C. J., and TAYLOR, SMITH and KNUDSON, JJ., concur.